2008-NMCA-066

187 P.3d 679

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**William DEMONGEY, Defendant–
Appellant.**

No. 26,453.

Court of Appeals of New Mexico.

Feb. 29, 2008.

Certiorari Granted, No. 31,015,
March 16, 2008.

Gary K. King, Attorney General, Katherine Zinn, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Nina Lalevic, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Chief Judge.

{1} Defendant appeals the district court's determination that he committed attempted second degree murder and assault on a peace officer with intent to commit a violent felony, and his subsequent commitment to the Las Vegas Medical Center (Las Vegas), pursuant to the New Mexico Mental Illness and Competency Act. *See* NMSA 1978, §§ 31–9–1 to –4 (1988, as amended through 1999). Defendant argues that (1) the district court's findings that he committed attempted second degree murder and assault with intent to commit a violent felony on a peace officer violated his right to be free from double jeopardy; (2) the evidence was insufficient to support the district court's findings; (3) his right to due process was violated by the length of time between his arraignment and the hearing to determine the sufficiency of the evidence against him (hereinafter "the evidentiary hearing"); and (4) the district court miscalculated his term of commitment. We conclude that Defendant's multiple convictions violate double jeopardy under his unit-of-prosecution argument, but not under his double-description argument. We also conclude that Defendant's term of commitment was miscalculated. We affirm on all remaining issues and we remand to the district court for recalculation of Defendant's term of commitment.

## BACKGROUND

{2} On December 11, 2000, Defendant was arraigned on multiple charges of attempted second degree murder, multiple charges of assault on a peace officer with intent to commit a violent felony, reckless driving, resisting, evading or obstructing an officer, as well as numerous other charges, which are not the subject of this appeal. On May 27, 2004, the district court entered an order committing Defendant to Las Vegas pursuant to Section 31–9–1.2, to receive treatment to attain competency. The parties stipulated that Defendant was incompetent to proceed and that he was dangerous as defined in Section 31–9–1.2(D). The district court ordered Defendant committed for a period not to exceed nine months and ordered that a competency hearing be held on August 27, 2004. On July 6, 2004, new counsel entered his appearance on behalf of Defendant. On October 13, 2004, Defendant waived the ninety-day review hearing and requested that his commitment continue pursuant to the original commitment order.

{3} The evidentiary hearing was held on September 15, 2005. At the hearing, details of the incident were reconstructed through the testimony of police officers and witnesses. Officer Sean Casaus testified that on November 23, 2000, while employed with the New Mexico State Police, he tried to stop Defendant for running a red light and speeding on Alameda Boulevard in Albuquerque, New Mexico. Defendant did not stop and instead continued to speed through two more red lights and a stop sign with Officer Casaus in pursuit. Between San Pedro Drive and Louisiana Boulevard, still on Alameda, Officer Casaus saw what appeared to be a muzzle flash come from Defendant's vehicle and heard something hit his windshield. Officer Casaus called dispatch and reported that shots had been fired. He then gave Defendant's vehicle some space, but continued pursuing Defendant eastbound on Alameda. After passing through the intersection of Alameda and Louisiana, Officer Casaus observed at least two more muzzle flashes come through the back window of Defendant's vehicle toward the officer. Officer Casaus testified that there was "some

time between" the muzzle flashes and that they did not occur in rapid succession, as would be expected with a semi-automatic weapon.

{4} Officer Casaus followed Defendant to a vacant field where Alameda ends at Barstow Street. Officer Casaus stopped his car about forty feet from where Defendant's vehicle was stopped and was now facing toward the officer's vehicle, and the officer saw Defendant exit his vehicle. Officer Casaus then got out and went around to the rear of the vehicle and then around to the passenger side. Defendant got back into his car and drove it straight toward the officer's vehicle. Still outside of his car, Officer Casaus saw Defendant manipulating something that appeared to be a rifle or a shotgun and point it out the window at him. Officer Casaus fired several rounds at Defendant's vehicle as it passed. The officer testified that Defendant's vehicle passed within five feet of him. He then followed Defendant westbound on Alameda, where Defendant's vehicle collided into another vehicle. Defendant fled the crash scene on foot and was later found sleeping in a dumpster.

{5} Pursuant to a search warrant, police later recovered a .303 caliber British Enfield bolt-action rifle, the muzzle of which was in the front passenger seat of Defendant's vehicle. The rifle magazine had five rounds in it, along with one in the chamber, and three spent casings from the rifle were recovered on the floor of the vehicle. Police also recovered an unloaded 12 gauge, sawed-off shotgun and a loaded starter pistol that had been altered to accept and fire .22 caliber long-rifle cartridges. Additionally, there were three bullet holes in the rear window of Defendant's vehicle that appeared to have been made by someone shooting from inside the vehicle. Defendant did not present any evidence.

{6} The district court concluded that Defendant committed numerous offenses by clear and convincing evidence, including four counts of attempted second degree murder (three during the high-speed chase based on the three gun shots and one at the dead end of Alameda and Barstow, when Defendant drove his vehicle directly toward the officer's

vehicle) and four counts of assault on a peace officer with intent to commit a violent felony (again, three during the high-speed chase based on the three gun shots and one when Defendant drove his vehicle at the officer's vehicle). The district court ordered Defendant committed to Las Vegas pursuant to Section 31–9–1.5(D). Additional facts are set out in the analysis section of this opinion.

## DISCUSSION

### Double Jeopardy

{7} Defendant argues that the district court's findings at the evidentiary hearing violated his constitutional right to be free from multiple punishments. "The Double Jeopardy Clause of the Fifth Amendment protects citizens against multiple punishments for the same offense." *State v. Bernal*, 2006–NMSC–050, ¶ 7, 140 N.M. 644, 146 P.3d 289. "Multiple punishment problems can arise from both 'double-description' claims, in which a single act results in multiple charges under different criminal statutes, and 'unit-of-prosecution' claims, in which an individual is convicted of multiple violations of the same criminal statute." *Id.* "Because the issue of whether there has been a double jeopardy violation is a constitutional one, our review is de novo." *State v. Ford*, 2007–NMCA–052, ¶ 7, 141 N.M. 512, 157 P.3d 77.

{8} Defendant raises both double-description and unit-of-prosecution challenges to the district court's findings at the evidentiary hearing. Defendant first argues that he was subject to multiple punishments because the same underlying conduct formed the basis for the district court's findings that he committed attempted second degree murder and assault on a peace officer with intent to commit a violent felony. Defendant also argues that the district court erroneously found that he committed three separate acts of each offense for each of the three shots fired during the high-speed chase during one continuous course of conduct. We address each argument in turn.

### 1. Unit–of–Prosecution Claim

{9} The district court found that each of the shots Defendant fired at Officer Casaus was a separate event and was therefore

separately punishable. Defendant argues that the three shots were fired during a continuous course of conduct and constitute one act. We review unit-of-prosecution cases using a two-part analysis. *See Bernal,* 2006–NMSC–050, ¶ 14. We first review the statutory language for guidance in determining the unit of prosecution. *Id.* If the statutory language is clear regarding the unit of prosecution, then our inquiry is complete, and we follow the statutory language. *Id.* "If the language is not clear, . . . we [proceed] to the second step, in which we determine whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Id.; State v. Collins,* 2007–NMCA–106, ¶ 19, 142 N.M. 419, 166 P.3d 480. "Finally, if we have not found a clear indication of legislative intent, we apply the 'rule of lenity,' a presumption against imposing multiple punishments for acts that are not sufficiently distinct." *State v. DeGraff,* 2006–NMSC–011, ¶ 32, 139 N.M. 211, 131 P.3d 61.

{10} In this case, neither party argues that the unit of prosecution is clearly defined in the relevant criminal statutes. *See In re Doe,* 98 N.M. 540, 541, 650 P.2d 824, 825 (1982) (stating that appellate courts should not address issues that the parties do not raise on appeal). We therefore proceed to the second step in the analysis and review whether Defendant's acts were separated by sufficient indicia of distinctness to allow for three convictions each of assault with intent to commit a violent felony upon a peace officer and attempted second degree murder. In making this determination, we look at a number of factors, including: "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *State v. Barr,* 1999–NMCA–081, ¶ 16, 127 N.M. 504, 984 P.2d 185. Additionally, we may consider whether Defendant's acts "were 'performed independently' of the other acts 'in an entirely different manner,' or whether such acts were of a 'different nature.' " *State v. Boergadine,* 2005–NMCA–028, ¶ 21, 137 N.M. 92, 107 P.3d 532

(quoting *Herron v. State,* 111 N.M. 357, 361, 805 P.2d 624, 628 (1991)).

{11} Our courts have addressed the question whether multiple shootings were unitary conduct, and on the facts of each of those cases, the appellate courts held that the conduct was unitary. *See State v. Gonzales,* 113 N.M. 221, 224, 824 P.2d 1023, 1026 (1992) (determining that the defendant's conduct of firing multiple gunshots into the victim's truck in rapid succession constituted one continuous course of conduct because the shots were not separated by either time or space); *State v. Handa,* 120 N.M. 38, 44, 897 P.2d 225, 231 (Ct.App.1995) (concluding that only one assault occurred in a single, continuous act where the defendant fired three shots at a peace officer and there was little if any time between the first and the subsequent shots); *see also State v. Varela,* 1999–NMSC–045, ¶ 39, 128 N.M. 454, 993 P.2d 1280 (recognizing that the defendant's action of firing four shots into a trailer in rapid succession was unitary conduct because the shots were not separated in time and space). In all of these cases, however, the shots were fired in rapid succession, whereas in this case there was a small elapse of time between each shot. Further, there was no change of location in those cases as there was here, where the shots were fired in the course of a high-speed pursuit.

{12} *Handa* is the most instructive to the case at hand. In *Handa,* during the course of a routine traffic stop, an officer learned that the defendant had an outstanding arrest warrant. 120 N.M. at 40, 897 P.2d at 227. Upon informing the defendant that he was under arrest, the defendant shot the officer. *Id.* The officer was standing outside the driver's side window of the defendant's vehicle and the defendant was seated in the driver's seat of his parked vehicle when the defendant fired three shots. *Id.* at 40, 43, 897 P.2d at 227, 230. The defendant stated that he shot at the officer, saw that the officer was hit but not dead, saw the officer fall to the ground, and then shot in the officer's direction two more times. *Id.* at 43, 897 P.2d at 230. Considering the *Herron* factors, this Court found no evidence of more than a single, continuous intent. *Id.* at 44,

897 P.2d at 231. We explained that "[t]he three shots were not separate and considered distinct acts but part of a single contact arising from a single, sustained intent[,] . . . each shot was accompanied by one protracted intention such that they may be implicated within a single charge." *Id.* (alteration omitted) (internal quotation marks and citation omitted). Looking to the span of time, we said, "there was little, if any, time between the first and subsequent shots." *Id.* We also considered that there was no change in location. *Id.* After considering all of these factors, we held that the conduct of the defendant firing three shots at the officer was unitary.

{13} Of particular note to the present case is our discussion in *Handa* of the factor of the temporal distance between the shots. *Id.* at 45, 897 P.2d at 232. We explained that:

> We emphasize that the time between each act is not dispositive. For example, if multiple shots are fired all pursuant to a single, continuous intent, they constitute a single offense, irrespective of whether an extensive period of time elapses between each shot. The proximity in time between criminal acts merely indicates that the greater the interval between acts, the greater the likelihood of separate offenses.

*Id.* at 44 n. 2, 897 P.2d at 231 n. 2 (alteration omitted) (internal quotation marks, citation, and emphasis omitted).

{14} In this case, there was evidence that Defendant fired each of the shots at Officer Casaus from different locations along Alameda Boulevard over a distance of about two miles. Additionally, Officer Casaus testified that there was "some time between" the shots and that they were not fired in rapid succession as would be expected with a semi-automatic weapon. Finally, according to the district court's conclusions of law, the three shootings were three separate acts because these separate shots occurred at different times and locations—and with Defendant's separate and distinct, multiple and rather complex actions, including one-handed re-loading, re-aiming, and re-firing the bolt-action rifle on three different occasions while driving 60–65 miles per hour on a narrow two-lane road over significant distances be-tween San Pedro Drive and past Louisiana Boulevard.

{15} Despite the district court's conclusion, we believe that the reasoning behind our cases, particularly *Handa,* requires a holding that the conduct here was unitary. While there was a time elapse between shots of up to two minutes, as well as a distance traveled of up to two miles, we cannot conclude that there were multiple, distinct acts in this case. All three shots were fired during one high-speed chase, in an extreme attempt to escape from the pursuing officer. In this context, two minutes is not a significant span of time. In addition, the fact that up to two miles were traveled does not weigh significantly in favor of multiple charges in the context of the high-speed chase. *Cf. State v. LeFebre,* 2001–NMCA–009, ¶¶ 2, 18, 130 N.M. 130, 19 P.3d 825 (concluding that the defendant's conduct was unitary, after considering the quality and nature of the acts over time and space considerations, where he led police on a high-speed chase through the streets of Santa Fe and on Interstate 25 for nearly half an hour, even after the defendant continued to flee on foot). Rather, we would have been more likely to determine distance in time and space as indicating a change in Defendant's intent or the nature of his conduct had he or the officer stopped or exited their vehicles during the firing of the three shots. *See State v. Mireles,* 2004–NMCA–100, ¶¶ 27–28, 136 N.M. 337, 98 P.3d 727 (concluding that conduct was not unitary where multiple shots were separated in time and space because the defendant first shot the victim near the vehicle he was in, the victim ran behind a store, the defendant exited his vehicle, chased victim, and shot victim again). In *Mireles,* the conduct supported an inference that the nature of the defendant's intent changed from shooting at the victim who had approached his vehicle to hunting down the victim in order to finish what he started. In this case, we see no indication of a change in Defendant's intent or the nature of his actions from the first shot to the last.

{16} Further, we are not persuaded that the fact that Defendant had to re-aim and then re-fire the gun indicates that each shot was distinct conduct. That Defendant was

using a bolt-action rifle seems incidental, rather than somehow probative of Defendant's intent. While Defendant certainly may have had more time to reflect upon whether or not to continue in his efforts to kill the officer while operating the bolt mechanism and re-aiming, there are nonetheless no facts in the record indicating that he did rethink his actions, or that he ceased intending to shoot at the officer and then reformulated such an intent. We believe that the nature and quality of Defendant's actions in the context of the high-speed chase are more probative than the distance in space and time between each shot. The nature of the conduct was one desperate attempt at fleeing and killing the officer in the process. The "multiple shots [were] fired all pursuant to a single, continuous intent, [and thus] they constitute a single offense, irrespective of [the] . . . period of time [which] elapse[d] between each shot." *Handa*, 120 N.M. at 44 n. 2, 897 P.2d at 231 n. 2. Also worthy of consideration is the fact that there was only one victim in this case. *See Barr*, 1999–NMCA–081, ¶ 16. We conclude that there was one unitary course of conduct for the three acts of shooting, under each of the charges of attempted murder and assault with intent to commit a violent felony on a peace officer. *See Handa*, 120 N.M. at 44–45, 897 P.2d at 231–32 (concluding that multiple shots were one unitary course of conduct); *Gonzales*, 113 N.M. at 224, 824 P.2d at 1026 (same); *see also LeFebre*, 2001–NMCA–009, ¶¶ 2, 18 (concluding that the defendant's action of fleeing from police and then by foot were one unitary act of resisting, evading, or obstructing an officer). Thus, with respect to the three shots during the high-speed chase, the Double Jeopardy Clause allows the district court to find that Defendant committed only one act for the three counts of attempted second degree murder and only one act for the three counts of assault with intent to commit a violent felony on a peace officer.

## 2. Double–Description Claim

{17} The district court found that each of the three shots Defendant fired at the officer was punishable as both attempted second degree murder and assault with intent to commit a violent felony on a peace officer.

Defendant argues that he was subject to multiple punishments because the same conduct formed the basis for his convictions for both offenses. In addressing double-description claims, we employ the two-part test set forth by our Supreme Court in *Swafford v. State*, 112 N.M. 3, 810 P.2d 1223 (1991). *See State v. Vallejos*, 2000–NMCA–075, ¶ 6, 129 N.M. 424, 9 P.3d 668.

{18} "First, we examine whether the conduct was unitary, meaning whether the same criminal conduct is the basis for both charges." *Bernal*, 2006–NMSC–050, ¶ 9. In this case, the State concedes that Defendant's conduct was unitary because Defendant's act of firing a gun at Officer Casaus formed the basis for the findings that he committed both attempted second degree murder and assault with intent to commit a violent felony on a peace officer. If the defendant's conduct is unitary, we next determine whether the Legislature intended to create separately punishable offenses for the same conduct. *See State v. Frazier*, 2007–NMSC–032, ¶ 15, 142 N.M. 120, 164 P.3d 1.

{19} Absent a clear expression of legislative intent, we first apply the test stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See State v. Armendariz*, 2006–NMSC–036, ¶ 21, 140 N.M. 182, 141 P.3d 526. Under the *Blockburger* test, we compare the elements of the relevant statutes to determine whether each requires proof of elements that the other does not. *Id.* When an offense is statutorily defined with several alternatives, "we focus on the legal theory of the case and disregard any inapplicable statutory elements." *State v. Carrasco*, 1997–NMSC–047, ¶ 27, 124 N.M. 64, 946 P.2d 1075. If each statute requires proof of elements that the other does not, then we presume that the Legislature intended to punish the offenses separately. *Armendariz*, 2006–NMSC–036, ¶ 22. "That presumption, however, is not conclusive and it may be overcome by other indicia of legislative intent." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234. These other indicia include "the social evils sought to be addressed by each offense" and "the language, structure, and legislative history" of

the two provisions. *Id.* at 9, 810 P.2d at 1229.

{20} Under the *Blockburger* test, attempted second degree murder and assault with intent to commit a violent felony on a peace officer are separate offenses because each requires proof of elements that the other does not. The elements of attempted second degree murder are that the defendant (1) committed an overt act in furtherance of killing, (2) intended but failed to effect its commission, and (3) knew that his actions created a strong probability of death or great bodily harm. *See* NMSA 1978, § 30–28–1 (1963); NMSA 1978, § 30–2–1(B) (1994); UJI 14–211 NMRA. Assault with intent to commit a violent felony on a peace officer required proof that (1) the defendant committed an assault on a peace officer, (2) the officer was in the lawful discharge of his duties, and (3) the defendant acted with intent to kill the officer. *See* NMSA 1978, § 30–22–23 (1971). Assault on a peace officer is defined as "an attempt to commit a battery upon the person of a peace officer while he is in the lawful discharge of his duties; or [ ] any unlawful act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery." NMSA 1978, § 30–22–21(A) (1971). The court below focused on the second alternative, which required that the officer reasonably believed he was in danger of an immediate battery. Attempted second degree murder requires proof of an overt act in furtherance of killing that tends to effect a killing, which is not required to prove assault on a peace officer. Conversely, assault with intent to commit a violent felony on a peace officer requires proof that the victim was a peace officer lawfully engaged in his duties, as well as that the officer reasonably believed he was in danger of an immediate battery, neither of which is an element of attempted second degree murder. Thus, there is a presumption that the Legislature intended to punish these two offenses separately.

{21} This presumption is not conclusive, however, and may be overcome by a contrary showing of legislative intent. *See State v. Cowden,* 1996–NMCA–051, ¶ 11, 121 N.M. 703, 917 P.2d 972. "Legislative intent may be gleaned from the statutory schemes by identifying the particular evil addressed by each statute; determining whether the statutes are usually violated together; comparing the amount of punishment inflicted for a violation of each statute; and examining other relevant factors." *Gonzales,* 113 N.M. at 225, 824 P.2d at 1027.

{22} The statutes at hand have different societal purposes. Defendant argues that both statutes address the same societal evil: "to protect the public from dangerous behavior." However, this is too broad a formulation of the relevant societal interests. *See Armendariz,* 2006–NMSC–036, ¶ 25 (stating that when determining the social harm to be protected, we must construe the harm narrowly); *Gonzales,* 113 N.M. at 225, 824 P.2d at 1027 (stating that social misconduct proscribed by different statutes are construed narrowly). "The prohibition against attempted murder is directed at protecting a person's life and the statute is directed at punishing a person's state of mind[.]" *Armendariz,* 2006–NMSC–036, ¶ 25. The legislative intent behind the assault statutes is to protect victims from mental harm associated with putting a person in fear. *See State v. Roper,* 2001–NMCA–093, ¶ 12, 131 N.M. 189, 34 P.3d 133 (stating that the harm protected by the assault statutes is mental harm, while the harm protected by the battery statutes is physical harm); *see also State v. Armijo,* 2005–NMCA–010, ¶ 30, 136 N.M. 723, 104 P.3d 1114 (stating that the aggravated assault statute is aimed at preserving bodily integrity against the threat of serious injury); *State v. Jensen,* 2005–NMCA–113, ¶ 9, 138 N.M. 254, 118 P.3d 762 (stating that "assault with intent to commit a felony is proscribed because it puts persons in fear" (alteration omitted) (internal quotation marks and citation omitted)). Additionally, the purpose behind the assault with intent to commit a violent felony on a peace officer statute is aimed at protecting peace officers specifically, rather than the general public. *See* § 30–22–23. Finally, nothing about the language of either statute suggests that the Legislature does not intend to punish the

two offenses separately. *See Carrasco,* 1997–NMSC–047, ¶ 33; *State v. Meadors,* 121 N.M. 38, 51–52, 908 P.2d 731, 744–45 (1995).

{23} Whether the crimes will usually be committed together, however, weighs against allowing conviction on both charges. It seems that, generally, most assaults with intent to commit a violent felony on a peace officer will also be an attempted murder. *See* § 30–22–23 (defining the offense as "assaulting a peace officer while he is in the lawful discharge of his duties with intent to kill the peace officer"). And, while not every attempted murder will be an assault with intent to commit a violent felony on a peace officer, when the victim of the attempted murder is an officer, it seems that the offenses will generally be committed together. Nonetheless, this is only one factor in our analysis, as is the circumstance that the offenses are punished differently, which is not determinative. *See Armendariz,* 2006–NMSC–036, ¶ 25 (stating that "this factor alone is not enough to overcome the other findings of legislative intent"); *Cowden,* 1996–NMCA–051, ¶ 13. Even when considered along with the fact that the offense of assault with intent to commit a violent felony on a peace officer will generally be committed along with attempted murder, we nonetheless conclude that these facts alone are not sufficient to overcome the presumption of multiple offenses based on the *Blockburger* analysis. Under the circumstances of this case, we believe the Legislature intended to punish the two offenses separately and hold that punishment for attempted second degree murder and assault with intent to commit a violent felony on a peace officer is permissible.

**Sufficiency of the Evidence**

{24} The district court determined that Defendant committed attempted second degree murder and assault with intent to commit a violent felony on a peace officer based on his act of aiming a sawed-off shotgun at the officer and rapidly accelerating his vehicle toward Officer Casaus near the vacant field at Alameda and Barstow. Defendant challenges the sufficiency of the evidence to

support the district court's determination that he committed either offense.

{25} We review challenges to the sufficiency of the evidence under a substantial evidence standard of review. *See State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *State v. Salgado,* 1999–NMSC–008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). "We review the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all reasonable inferences in favor of the verdict." *State v. Stefani,* 2006–NMCA–073, ¶ 33, 139 N.M. 719, 137 P.3d 659. "For Section [31–9–1.5] hearings, the burden of proof the State must meet is clear and convincing evidence of the crime." *State v. Taylor,* 2000–NMCA–072, ¶ 18, 129 N.M. 376, 8 P.3d 863.

{26} In order to find Defendant guilty of attempted second degree murder, the district court was required to determine that Defendant (1) committed an overt act in furtherance of second degree murder, (2) intended but failed to effect commission of second degree murder, and (3) knew that his actions created a strong probability of death or great bodily harm. *See* § 30–28–1; § 30–2–1(B). In order to find Defendant guilty of assault with intent to commit a violent felony on a peace officer, the district court had to determine that Defendant "assault[ed] a peace officer while he [was] in the lawful discharge of his duties with intent to kill the peace officer." § 30–22–23(A). An assault on a peace officer consists of "(1) an attempt to commit a battery upon the person of a peace officer while he is in the lawful discharge of his duties; or (2) any unlawful act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery." § 30–22–21(A).

{27} Viewing the evidence in the light most favorable to the State, we believe that there was sufficient evidence to support the district court's determination that Defendant committed both offenses. Defendant

argues specifically that the evidence was insufficient to show his intent to kill Officer Casaus, which is an element of both offenses. We disagree. Defendant rapidly accelerated his vehicle in the eastbound lane toward the officer after the officer had gotten out of his car. Officer Casaus testified that Defendant's vehicle came within five feet of him. According to the officer's testimony, Defendant pointed a rifle or a shotgun at the officer, and had already fired three shots at the officer. *State v. Reed,* 2005–NMSC–031, ¶ 36, 138 N.M. 365, 120 P.3d 447 (stating that the defendant's act of pointing a loaded weapon at the victim with the knowledge that it could fire would support an inference that the defendant intended to kill the victim or created a strong probability of death or great bodily harm). We think that the evidence is sufficient from which the district court could infer Defendant's intent to kill. *See State v. Allen,* 2000–NMSC–002, ¶ 65, 128 N.M. 482, 994 P.2d 728 (stating that circumstantial evidence may be used to prove intent); *State v. Brenn,* 2005–NMCA–121, ¶ 24, 138 N.M. 451, 121 P.3d 1050 ("Intent is usually established by circumstantial evidence.").

{28} Defendant also argues that Officer Casaus' testimony that he believed the item Defendant aimed at him was a rifle or a shotgun was insufficient to establish that the item was in fact either. Defendant argues that without such evidence, the State could not prove attempted second degree murder or assault with intent to commit a violent felony on a peace officer. We first note that the evidence was sufficient to show that Defendant pointed a rifle or a sawed-off shotgun at Officer Casaus as he drove toward him. Officer Casaus testified that Defendant aimed what appeared to be a rifle or a shotgun at him, and the officer testified as to his familiarity with weapons. Police also recovered both a rifle and a sawed-off shotgun from Defendant's vehicle.

{29} Additionally, the district court's findings of attempted second degree murder and assault with intent to commit a violent felony on a peace officer were based both on Defendant's pointing a weapon at the officer and his act of rapidly accelerating his vehicle toward the officer. Even if the evidence

were insufficient to show that Defendant aimed a gun at Officer Casaus, his act of driving his vehicle toward the officer at a high rate of speed was sufficient to sustain the district court's findings that he committed both attempted second degree murder and assault with intent to commit a violent felony on a peace officer. Defendant does not argue otherwise in his briefs. For these reasons, we hold that the evidence presented at the evidentiary hearing was sufficient to sustain the district court's findings that Defendant committed the offenses by clear and convincing evidence.

**Due Process**

{30} Defendant also argues that his right to due process was violated because there was a five-year delay between his arraignment for the offenses and the evidentiary hearing. Defendant argues that this constitutes an excessive delay and that all charges against him must be dismissed. The State responds that Defendant was afforded repeated hearings during that time and that any delay to determine competency was for Defendant's benefit. The State also argues that Defendant has not demonstrated any prejudice resulting from the delay.

{31} Defendant was arraigned for the offenses on December 11, 2000. On February 5, 2001, private counsel entered appearance on Defendant's behalf. On June 5, 2001, the State motioned for an extension of time pursuant to Rule 5–604 NMRA and stated that there may be a competency issue in the case. On September 4, 2001, the district court entered an order granting the State's Rule 5–604 petition for extension of time. In that order, the court stated that defense counsel had raised an issue as to Defendant's competency and it ordered a competency evaluation.

{32} On October 3, 2001, the district court entered an order staying proceedings to determine Defendant's competency. In the order, the court took judicial notice of a prior order for a competency evaluation. On January 10, 2002, the State requested a status conference stating that the competency evaluation had not yet been conducted. A status conference was held on February 2, 2002,

and the district court entered another order for a competency evaluation. On June 14, 2002, another status conference was held and the district court entered a third order for a competency evaluation. The record is then silent until June 4, 2003, when new counsel for Defendant entered his appearance. On August 14, 2003, Defendant's new counsel motioned to suspend the proceedings pending a determination of competency. In the motion, defense counsel stated that a prior competency evaluation had not been performed due to the Department of Health evaluator's conflict of interest. Defendant also stated that a competency evaluation was scheduled for September 11, 2003. The record does not indicate whether this competency evaluation was ever performed.

{33} Sections 31–9–1 to –1.5 set out the procedure to be followed when a criminal defendant is alleged to be incompetent to stand trial. Under the Competency Act, "[w]henever it appears that there is a question as to the defendant's competency to proceed in a criminal case, any further proceeding ... shall be suspended until the issue is determined." § 31–9–1; *see also State v. Rotherham,* 122 N.M. 246, 252, 923 P.2d 1131, 1137 (1996) (stating that "[s]uspension of the criminal process where the defendant is incompetent is fundamental to assuring the fairness, accuracy, and dignity of the trial"). The Competency Act requires that the defendant's competency be professionally evaluated by a psychiatrist, psychologist, or other qualified professional and a report be submitted to the district court before the court determines the issue of competency. *See* § 31–9–1.1. If the defendant is incarcerated for a felony, the district court must conduct a competency hearing "within a reasonable time, but in no event later than thirty days after notification to the court of completion of the diagnostic evaluation." *Id.* If the district court determines that the defendant is incompetent to proceed and that he is "dangerous" as defined in Section 31–9–1.2(D), it may order the defendant into treatment to attain competency. § 31–9–1.2(B).

{34} Much of the delay Defendant complains of occurred awaiting a determination of his competency. Defendant argues that a determination of his competency was not made within a reasonable period of time as required by the Competency Act. Pursuant to Section 31–9–1.1, a competency hearing for a defendant incarcerated for a felony must be conducted "within a reasonable time, but in no event later than thirty days after notification to the court of completion of the diagnostic evaluation." § 31–9–1.1. However, "[o]ur law requires that when a question as to a defendant's competency is raised, the defendant's competency must be professionally evaluated by a qualified professional who must submit a report to the court." *State v. Flores,* 2005–NMCA–135, ¶ 17, 138 N.M. 636, 124 P.3d 1175. The district court cannot make a determination of competency until the mental evaluation is completed. *See id.;* NMSA 1978, § 31–9–2 (1967) ("Upon motion of any defendant, the court shall order a mental examination of the defendant before making any determination of competency under Sections 41–13–3 [NMSA 1953] or 31–9–1 NMSA 1978."); *see also* Rule 5–602(C) NMRA (stating that, upon motion or good cause, the district court shall order a mental evaluation of the defendant before determining competency to stand trial).

{35} Based on the record presented, it appears that a determination of Defendant's competency was not made during this time because no mental evaluation was submitted to the district court despite repeated court-ordered evaluations. Between September 4, 2001, when the district court entered its order extending the time to commence trial, and June 4, 2003, when the public defender entered his appearance, the district court entered three separate orders to determine competency. Defendant's new counsel informed the district court on August 14, 2003, that a competency evaluation had not yet been performed and stated that one was scheduled for September 11, 2003. Defendant does not inform us, and the record does not reflect, whether any competency evaluations were conducted pursuant to these orders. Nor does the record indicate that Defendant ever raised any objection to the proceedings to determine his competency. Under these circumstances, we do not believe that Defendant has demonstrated that negligence on the part of the State lead

to an unreasonable delay in the commitment proceedings. *See Rotherham,* 122 N.M. at 264, 923 P.2d at 1149 (stating that delay in commitment proceedings caused by the State's negligence will not be excused).

{36} We also believe that Defendant acquiesced in his commitment to Las Vegas to receive treatment to attain competency between May 27, 2004, and the evidentiary hearing. Pursuant to Section 31–9–1.2(D), the district court ordered Defendant committed to Las Vegas for a period not to exceed nine months after Defendant and the State stipulated that Defendant was incompetent and dangerous. Las Vegas requested an extension to file the ninety-day report until October 4, 2004, which was granted. On October 13, 2004, Defendant waived the ninety-day statutory review hearing and informed the district court that he did not oppose his continued commitment to Las Vegas. Defendant stated that there was a possibility that he could be treated to competency within nine months of the original commitment order. At a July 15, 2005, status conference, defense counsel and the prosecutor indicated that they had been working to arrange for Defendant's civil commitment to Las Vegas. *See Rotherham,* 122 N.M. at 264, 923 P.2d at 1149 (stating that "there may be reasonable delays in administration and treatment that would require hearings to be held later than anticipated" and that delays in commitment proceedings caused by the defendant's "own initiative will not suffice for dismissal"). Under these circumstances, we do not believe that Defendant was denied due process by his commitment to Las Vegas beyond the district court's original commitment order to receive treatment to attain competency.

■ {37} Finally, we do not believe that Defendant has established that he was prejudiced by any delay in the proceedings. "[T]o establish a due process violation, and thus reversible error, the defendant must demonstrate prejudice." *State v. Duran,* 107 N.M. 603, 608, 762 P.2d 890, 895 (1988), *superseded by rule as stated in State v. Gutierrez,* 1998–NMCA–172, 126 N.M. 366, 969 P.2d 970. Defendant states that he was prejudiced by

the delay in determining competency because he attempted suicide in 2001, while in the Bernalillo County Detention Center and has a permanent, moderate traumatic brain injury as a result. Defendant appears to argue that his suicide attempt was caused by delay in the competency proceedings and that his brain injury adds to his inability to be brought to competency.

{38} However, we have no record on which to evaluate this claim because Defendant did not raise a due process challenge to the timing of the competency proceedings in district court. He did not present any evidence of prejudice that he suffered by a delay in the proceedings. Defendant argues that this lack of a record is due to the district court's refusal to hear the matter. Defendant states that he raised this issue in a motion for reconsideration filed after the evidentiary hearing, which the district court did not hear. However, contrary to Defendant's assertion, he did not raise this issue in the district court. Rather, Defendant's motion for reconsideration challenged the sufficiency of the evidence to support the court's findings that Defendant committed the offenses and asked the district court to reconsider the length of Defendant's commitment to Las Vegas. In the motion, Defendant argued that five years had passed without trial occurring and that Defendant's commitment to attain competency would result in further delays. On this basis, Defendant argued that his right to due process and a speedy trial would be impacted. However, Defendant did not argue in his motion for reconsideration, or anywhere else in the record, that he was denied due process because of the length of time between his arraignment and the evidentiary hearing, or that he was prejudiced by any delay in the competency proceedings. We therefore reject Defendant's argument that the district court's denial of the motion for reconsideration constituted a refusal to hear his due process claim.

## Length of Commitment

■ {39} Defendant argues that the district court erred under Section 31–9–1.5(D)(2) by including the basic sentences for the misdemeanor crimes of resisting, evad-

ing, or obstructing a police officer and reckless driving in calculating his term of commitment to Las Vegas. The district court's inclusion of the basic sentences for the misdemeanors added 818 days to Defendant's term of commitment. We review the interpretation of Section 31–9–1.5 de novo. *See State v. Chorney,* 2001–NMCA–050, ¶ 4, 130 N.M. 638, 29 P.3d 538.

{40} Section 31–9–1.5(D)(2) provides that when the district court finds by clear and convincing evidence that an incompetent defendant committed one of the felonies enumerated in Section 31–9–1.5(D), it can order the defendant committed to a secure facility for a "period of time equal to the maximum sentence to which the defendant would have been subject had the defendant been convicted in a criminal proceeding." § 31–9–1.5(D)(2). Defendant argues, and the State agrees, only those felonies enumerated in Section 31–9–1.5(D), which trigger commitment, can be used to determine the maximum sentence under Section 31–9–1.5(D)(2).

{41} In *Chorney,* this Court considered whether a term of commitment pursuant to Section 31–9–1.5 could be enhanced under the Habitual Offender Act. 2001–NMCA–050, ¶¶ 13–21. We stated that "[w]here the sole reason for maximum sentence criminal commitment to a secure and locked facility is the dangerousness of the defendant, it is reasonable to conclude that the 'maximum sentence' under Section 31–9–1.5(D)(2) can consist only of basic sentences for the crimes that trigger commitment, and any enhancements of those basic sentences that are expressly based on inherently dangerous criminal conduct as set out in Section 31–9–1.5(D) or defined in Section 31–9–1.2." 2001–NMCA–050, ¶ 14. Because misdemeanors cannot trigger commitment under the Competency Act, they cannot be used to calculate the maximum sentence under Section 31–9–1.5(D)(2). Because we reverse on this basis, we do not reach Defendant's other arguments regarding the district court's finding that he committed resisting, evading, or obstructing an officer.

{42} Additionally, the district court improperly determined that attempted second degree murder is a second degree felony

with a basic sentence of six years imprisonment. In fact, attempt to commit second degree murder is a third degree felony with a basic sentence of three years imprisonment. *See* § 30–2–1(B) (stating that murder in the second degree is a second degree felony); § 30–28–1(B) (stating that attempt to commit a second degree felony is a third degree felony); NMSA 1978, § 31–18–15(A)(5) (1999) (amended 2007) (current version at § 31–18–15(A)(9)) (stating that a third degree felony not resulting in the death of a human being carries a basic sentence of three years imprisonment). Accordingly, the maximum sentence that Defendant is subject to for the two attempted second degree murder convictions is six years.

**CONCLUSION**

{43} We reverse the district court's calculation of Defendant's term of commitment to Las Vegas. Further, we conclude that the Double Jeopardy Clause allows the district court to only find that Defendant committed one act of attempted second degree murder and one act of assault with intent to commit a violent felony on a peace officer for the conduct of firing the three shots at the officer during the high-speed chase. We affirm on all other issues. We remand this case to the district court with instructions to enter a new commitment order consistent with this opinion.

{44} **IT IS SO ORDERED.**

I CONCUR: CELIA FOY CASTILLO, Judge.

IRA ROBINSON, Judge, concurring in part and dissenting in part.

ROBINSON, Judge, concurring in part and dissenting in part.

{45} I concur with the majority in reversing the district court's calculation of the term of Defendant's commitment to the Las Vegas Medical Center. I dissent from the majority's conclusion that the Double Jeopardy Clause prohibits the court from finding more than one act of attempted second degree murder and one act of assault with intent to commit a violent felony on a peace officer.

{46} I dissent because I do not see a violation of the Double Jeopardy Clause. I agree with the district court that each of the three shots fired at Officer Casaus was a separate event. The shots took separate and distinct efforts by Defendant in different and changing locations. He simply committed three separate acts, and each is separately punishable. Neither party argues that the unit of prosecution is clearly defined, and we must therefore proceed to the second step in the analysis of whether Defendant's acts were separated by sufficient indicia of distinctness to allow for three convictions. I have determined that there are such indicia of distinctness present.

{47} Each of the three shots was fired from a different location along Alameda Boulevard over a two-mile distance. Furthermore, the shots were not fired in rapid succession, and there was some time between each shot. These facts are different from those in *Varela* where the defendant's conduct of firing multiple shots into the victim's truck in rapid succession, constituted one continuous course of conduct because the shots were not separated by time or space. 1999–NMSC–045, ¶ 39.

{48} I, therefore, respectfully concur in part and dissent in part.