This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-37674**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**NARCIZO SOTO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred T. Van Soelen, District Judge**

Hector H. Balderas, Attorney General
Benjamin Lammons, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**MEDINA, Judge.**

**{1}** Defendant was convicted of one count of aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963), and two counts of negligent use of a deadly weapon, contrary to NMSA 1978, Section 30-7-4(A) (1993). Defendant raises two issues on appeal: (1) insufficient evidence supported his conviction for aggravated assault with a deadly weapon and for one conviction of negligent use of a deadly weapon; and (2) alternatively, that his convictions for two counts of negligent use of a deadly weapon violate double jeopardy. With the exception of one conviction for

negligent use of a deadly weapon, which we reverse on double jeopardy grounds, we affirm.

**BACKGROUND**

**{2}**     Late one night, Theresa Gallegos's (Gallegos) son woke her up and alerted her to a suspicious commotion occurring next door. Gallegos walked into her den and peered out the window towards the home of her next-door neighbor, Maria Soto (Soto). Gallegos saw Soto, Soto's grandson (Defendant), and his girlfriend on Soto's porch. Gallegos then saw Defendant twice put a small handgun to Soto's head. Gallegos immediately said to herself, "Oh hell no . . . he's not going to do this to her" and stepped outside to intervene. Gallegos called out to Soto, "Grandmother, come to my porch!" Gallegos called 911 to report Defendant's conduct.

**{3}**     As Soto walked towards Gallegos's porch, Defendant walked towards the community mailboxes located in front of Gallegos's house. Defendant told Gallegos to "mind [her own] business," accused her of being a "cop caller," and told Gallegos, "I'll kill you." Defendant then pointed the gun at Gallegos. Gallegos cautioned Defendant, "If you're gonna do it . . . you better make sure that's what you want to do . . . because . . . you can't change what you do." Defendant then raised the gun in the air and fired two shots. When Defendant fired the gun, Gallegos realized with certainty that the gun was real. Gallegos testified that she was not afraid because she "felt like [she] was protected by God." Gallegos remained on the line with the 911 operator during the encounter and saw Defendant and his girlfriend flee at the sound of police sirens.

**{4}**     Sergeant Travis Loomis of the Clovis Police Department responded to the 911 call. He spoke with Gallegos and Soto at the scene. Sergeant Loomis recorded his conversation with Gallegos on his body camera, and a redacted version of the recording was played for the jury.

**{5}**     Officer Brent Aguilar found a spent shell casing consistent with a small caliber handgun on the roadway near the community mailboxes in front of Gallegos's house. Officer Aguilar testified that he "suspected [the spent casing] hadn't been there very long" because the shell lacked debris and had not been run over.

**{6}**     Detective Dale Rice testified that a second shell casing, which was darker in color than the first, was found near the back door of Soto's house—less than one hundred fifty yards from Gallegos's house. Both casings bore identical .380 caliber stamps, which is consistent with a small handgun. Detective Rice opined that the second casing's darker color could have been caused by "anything" and that the casing might have been there for "a little while" before it was recovered by police that evening.

**{7}**     Relevant to this appeal, Defendant was charged with aggravated assault with a deadly weapon and two counts of negligent use of deadly weapon. A jury convicted Defendant of these three counts. We reserve further discussion of specific facts where necessary to our analysis.

**DISCUSSION**

**Sufficient Evidence Supports Defendant's Convictions for Aggravated Assault With a Deadly Weapon and Negligent Use of a Deadly Weapon**

**{8}** Defendant argues that the evidence was insufficient to support his conviction for aggravated assault and his second count of negligent use of a deadly weapon conviction. In reviewing challenges to sufficiency of the evidence, we determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Baca*, 2019-NMSC-014, ¶ 17, 448 P.3d 576 (internal quotation marks and citation omitted). Evidence is viewed "in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. On review, we "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting [our] judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations, internal quotation marks, and citation omitted).

**A.     Aggravated Assault With a Deadly Weapon**

**{9}** "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883. In order to convict Defendant of aggravated assault with a deadly weapon, the jury was instructed to find in relevant part that: (1) Defendant pointed a firearm at Gallegos; (2) Defendant's conduct caused Gallegos to believe Defendant was about to intrude on Gallegos's bodily integrity or personal safety by touching or applying force to Gallegos in a rude, insolent, or angry manner; (3) a reasonable person in the same circumstances as Gallegos would have had the same belief; and (4) Defendant used a firearm. *See* UJI 14-305 NMRA.

**{10}** "Our law of assault generally requires evidence that the victim actually, subjectively comprehended that he or she was going to receive unwelcome physical contact." *State v. Arrendondo*, 2012-NMSC-013, ¶ 15, 278 P.3d 517. "The requirement that the victim must *actually believe*, and that a *reasonable person* in the victim's circumstances also *would believe*, that he or she was about to be assaulted indicates a dual subjective and objective test." *Id.* ¶ 14. As a result, the State was required to prove beyond a reasonable doubt that Defendant's conduct caused Gallegos to believe that Defendant was about to intrude upon her bodily integrity or personal safety, and that a reasonable person under the same circumstances would share a similar belief. Defendant exclusively challenges the sufficiency of the evidence with regard to the former requirement and for that reason, we limit our review to Gallegos's subjective belief that she was in danger of receiving an immediate battery.

**{11}**     Viewing the evidence in the light most favorable to the guilty verdict, we conclude that sufficient evidence supports the jury's finding that Gallegos believed she was about to receive an immediate battery. Gallegos testified that she found it necessary to intervene after witnessing Defendant place a gun to the head of his grandmother and did so by summoning Soto to the safety of her porch and by calling 911. Gallegos testified that Defendant responded by accusing her of being a "cop caller," and after walking towards the mailboxes in front of her home, Defendant pointed the gun at her. Gallegos told Sergeant Loomis that Defendant threatened to kill her and that she responded to the threat by cautioning Defendant to consider the finality of his actions.

**{12}**     Taken as a whole, the jury could reasonably infer that Gallegos cautioned Defendant about the finality of his actions because she believed Defendant was about to shoot her, and thereby intrude on her bodily integrity or personal safety when he pointed the gun at her. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (explaining that review by appellate courts requires "scrutiny of the evidence . . . to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction" (internal quotation marks and citation omitted)).

**{13}**     Defendant argues the State did not meet its burden of proving Gallegos subjectively believed she was in danger of receiving an imminent battery because she testified that she was not afraid because she was "protected by God," because Gallegos initially thought the gun might have been a cap gun, and she did not know whether "it was a real gun or not" until Defendant shot it in the air. While this is one interpretation of the evidence, a reasonable jury could have also inferred that (1) Gallegos did not fear dying when Defendant pointed the gun at her because of her religious beliefs, and (2) despite her uncertainty, she believed the gun might be real. This is especially true given Gallegos's testimony that she cautioned Defendant to consider the finality of his threat when he pointed the gun at her. *See State v. Stefani*, 2006-NMCA-073, ¶ 39, 139 N.M. 719, 137 P.3d 659 (stating that a "jury [is] free to draw inferences [from] the facts [as] necessary to support a conviction"); *see also State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that it is for the fact-finder to resolve any conflict in the testimony of the witnesses and to determine where the weight and credibility lie). We therefore affirm Defendant's conviction for aggravated assault with a deadly weapon.

## B.     Negligent Use of a Deadly Weapon

**{14}**     Defendant next challenges the sufficiency of the evidence with respect to one of his two convictions for negligent use of a deadly weapon, contending "there is no evidence in this case that [Defendant] actually fired a second shot[.]" In order to convict Defendant of negligent use of a deadly weapon, the jury was required to find in relevant part that "[D]efendant discharged a firearm within one hundred and fifty yards of a dwelling without permission of the owner or lessee." *See* UJI 14-703 NMRA.

**{15}** At trial, Gallegos testified that Defendant fired two shots into the air near the community mailboxes in front of her house. This testimony alone was sufficient to support the jury's conclusion that he discharged the gun twice. *See, e.g., State v. Hunt*, 1972-NMCA-026, ¶ 2, 83 N.M. 546, 494 P.2d 624 (stating that the victim's testimony, alone, in which she identified the defendant as the person who beat and robbed her was sufficient to affirm the defendant's robbery conviction); *State v. Riley*, 1970-NMCA-015, ¶ 6, 82 N.M. 298, 480 P.2d 693 ("The testimony of a single witness may legally suffice as evidence to support a jury's verdict.").

**{16}** To the extent Defendant asks this Court to reweigh the evidence and discount Gallegos's testimony, we will not do so. *See Garcia*, 2011-NMSC-003, ¶ 5 (stating appellate courts will not supplant the jury's role as fact-finder). Insofar as the jury may have additionally relied on the presence of the second shell casing to corroborate Gallegos's testimony, any conflict created by the description of the shell's color or the officer's opinion that it might have been there for "a little while" was for the jury to resolve. *See State v. Jackson*, 2018-NMCA-066, ¶ 25, 429 P.3d 674 ("It is for the jury to resolve conflicts in the evidence at trial, and we resolve conflicts in the light most favorable to the verdict."), *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-37267, Oct. 15, 2018).

**{17}** Viewing the evidence in the light most favorable to the guilty verdict, we conclude that sufficient evidence supports each of Defendant's convictions for negligent use of a firearm.

## Defendant's Second Conviction for Negligent Use of a Deadly Weapon Violates Double Jeopardy

**{18}** Having concluded sufficient evidence supports each of Defendant's convictions for negligent use of a deadly weapon, we now determine whether these convictions violate his right to be free from double jeopardy.

**{19}** Our Federal and State Constitutions guarantee that no person shall be "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. We review double jeopardy claims de novo. *See State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747 ("A double jeopardy challenge is a constitutional question of law which we review de novo."). "Double jeopardy protects against both successive prosecutions and multiple punishments for the same offense." *State v. Carson*, 2020-NMCA-015, ¶ 31, 460 P.3d 54 (alteration, internal quotation marks, and citation omitted), *cert. denied*, 2020-NMCERT-___ (No. S-1-SC-38128, Feb. 6, 2020). Defendant raises the latter type—multiple punishments for the same offense. Multiple punishment cases are classified in one of two ways: "double description cases in which a single act results in multiple charges under different criminal statutes" and "unit of prosecution cases in which an individual is convicted of multiple violations of the same criminal statute." *State v. Gallegos*, 2011-NMSC-027, ¶ 31, 149 N.M. 704, 254 P.3d 655 (alterations, internal quotation marks, and citations omitted). Because Defendant asserts that his unitary

conduct resulted in multiple convictions under the same statute, we apply the unit of prosecution analysis.

**{20}**     In analyzing a unit of prosecution claim, the relevant inquiry is "whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *Swafford v. State*, 1991-NMSC-043, ¶ 8, 112 N.M. 3, 810 P.2d 1223. "The plain language of the statute is the primary indicator of legislative intent." *State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230. Therefore, we commence our analysis by reviewing the plain language of "the statute to determine whether the Legislature has defined the unit of prosecution and, if the statute spells out the unit of prosecution, then the court follows that language and the inquiry is complete." *Id.* If, however, the unit of prosecution is not defined, we must then "determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments." *Swick*, 2012-NMSC-018, ¶ 33 (internal quotation marks and citation omitted). "If there is no distinctness to the acts charged," under the rule of lenity, "doubt will be resolved against turning a single transaction into multiple offenses." *Olsson*, 2014-NMSC-012, ¶ 18 (internal quotation marks and citation omitted).

**{21}**     Section 30-7-4(A)(4) defines negligent use of a deadly weapon as "discharging a firearm within one hundred fifty yards of a dwelling or building . . . without the permission of the owner or lessees thereof." Defendant argues the statute prohibits "handling or using a firearm under certain circumstances," but does not "clearly define the unit of prosecution as punishing each distinct act of discharging, carrying, handling or using a firearm as a separate offense." Because we agree that the statute does not clearly define the unit of prosecution, we proceed to the next step in the analysis and review whether the Defendant's acts were separated by sufficient indicia of distinctness.

**{22}**     In order to determine whether Defendant's actions have a "sufficient indicia of distinctness" to permit multiple punishments, we look to whether his actions are sufficiently distinct in terms of the "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *Carson*, 2020-NMCA-015, ¶ 34 (internal quotation marks and citation omitted) (citing and explaining various applications of the six-part test developed in *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624).

**{23}**     In answering this question, Defendant directs our attention to *State v. Demongey*, 2008-NMCA-066, 144 N.M. 333, 187 P.3d 679. In *Demongey*, the defendant fired at least three shots at a police officer from a moving vehicle during a high-speed chase and was convicted on three separate counts for assault on a peace officer with intent to commit a violent felony, among other crimes. *Id.* ¶¶ 3-6. On appeal, this Court examined the defendant's conduct to determine whether sufficient indicia of distinctness allowed three separate convictions of assault on a peace officer with intent to commit a violent felony. *Id.* ¶¶ 10-16.

**{24}** In deciding *Demongey*, we found *State v. Handa*, 1995-NMCA-042, 120 N.M. 38, 897 P.2d 225, to be particularly instructive. *Demongey*, 2008-NMCA-066, ¶¶ 12-16. In *Handa*, we previously explained: "The three shots were not separate and considered distinct acts but part of a single contact arising from a single, sustained intent. Thus, each shot was accompanied by one protracted intention such that they may be implicated within a single charge." 1995-NMCA-042, ¶ 24 (alteration, internal quotation marks, and citation omitted). After examination of the defendant's three separate shots in light of the timing, location, and sequence of the events, with particular attention paid to the defendant's intentions, we concluded that only one act of assault on a peace officer with intent to commit a violent felony had occurred. *Demongey*, 2008-NMCA-066, ¶¶ 10-16.

**{25}** Here, after pointing his gun at Gallegos, Defendant raised the gun into the air and fired two successive shots. Defendant did not change physical locations between the firing of each shot nor were there any intervening events between each shot. Moreover, "[w]e find no evidence in the record to support the existence of more than a single, continuous intent." *Handa*, 1995-NMCA-042, ¶ 24. Defendant's conduct and utterances do not suggest that his intention—that is, to fire his gun into the air because he was upset with Gallegos for being a "cop caller"—changed between the first and second shot. Based on these facts, we find that Defendant's firing of two successive shots into the air were not sufficiently distinct as to warrant his separate convictions for negligent use of a deadly weapon.

**{26}** To the extent the State invites us to rely on the ruling of the Utah Supreme Court in *State v. Rasabout*, 356 P.3d 1258 (Utah 2015), and that of the Nevada Supreme Court in *Washington v. State*, 376 P.3d 802 (Nev. 2016), we decline to do so. The State relies on these out-of-state authorities to support the proposition that the intended unit of prosecution for negligent use of a deadly weapon is "each gunshot, not the number of firearms, or the intent of the shooter." These cases, however, involve statutes that transcend the prohibition against the negligent use of a deadly weapon at issue here. *See Rasabout*, 356 P.3d at 1262-65 (interpreting unit of prosecution for a statute prohibiting discharge of a firearm from a vehicle after the defendant fired twelve shots at an occupied home during a drive-by shooting); *Washington*, 376 P.3d at 805-08 (analyzing a statute prohibiting willful and malicious discharge of firearm into a structure for redundancy after the defendant fired ten shots at an occupied apartment during a drive-by shooting). As Defendant aptly notes, had the defendants in *Rasabout* and *Washington* committed identical acts in New Mexico, they would have been charged under NMSA 1978, Section 30-3-8 (1993) for the willful discharge of a firearm at a dwelling or occupied building—not under Section 30-7-4.

**{27}** Finally, as the State acknowledged when asking us to distinguish *Demongey* from the present facts, "the legislative intent [for different statutes] is not the same." Because the statutes at issue in the out-of-state cases are "markedly different" than Section 30-7-4, we do not find them persuasive in determining the New Mexico Legislature's intended unit of prosecution for negligent use of a deadly weapon. *See State v. Office of Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶ 28, 285 P.3d 622

(explaining that courts must be mindful of relying on jurisprudence from other jurisdictions when interpreting statutes to "ensure that another court is not relying on language that is absent from our statute or that the language of the statute differs so greatly from ours that it serves a different purpose").

{28}    "If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the [L]egislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes." *State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289. "[A]bsent an express indication to the contrary," we do not presume the Legislature "intend[ed] to fragment a course of conduct into separate offenses." *Swafford*, 1991-NMSC-043, ¶ 8. Resolving doubt about the Legislature's intended unit of prosecution in favor of Defendant, we reverse Defendant's second conviction for negligent use of a deadly weapon. *See State v. Sena*, 2016-NMCA-062, ¶ 9, 376 P.3d 887 ("Under the rule of lenity, doubt is resolved in a defendant's favor and against turning a single act into multiple offenses.").

## CONCLUSION

{29}    For the above-stated reasons, the rulings of the district court are affirmed in part and reversed in part. We remand to the district court with instructions to vacate Defendant's second conviction for negligent use of a deadly weapon and to resentence accordingly.

{30}    **IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**