# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2020-NMCA-015**

**Filing Date: November 5, 2019**

**No. A-1-CA-35211**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**WALLACE G. CARSON,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Judith K. Nakamura, District Judge**

Certiorari Denied, February 6, 2020, No. S-1-SC-38128. Released for publication April 7, 2020.

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**HANISEE, Chief Judge.**

**{1}**    A jury convicted Defendant Wallace G. Carson of two counts of human trafficking, pursuant to NMSA 1978, Section 30-52-1(A)(1) (2008), one count of human trafficking of a minor, pursuant to Section 30-52-1(A)(2), two counts of promoting prostitution, pursuant to NMSA 1978, Section 30-9-4 (1981), two counts of accepting earnings of a prostitute, pursuant to NMSA 1978, Section 30-9-4.1 (1981), and kidnapping, pursuant to NMSA 1978, Section 30-4-1 (2003). On appeal, Defendant

argues that (1) the district court erred in admitting testimony regarding Defendant's uncharged acts in Texas; (2) his convictions for two counts of human trafficking related to the same victim violate double jeopardy; (3) the State presented insufficient evidence to support his kidnapping conviction; and (4) the district court failed to instruct the jury on the knowledge requirement for human trafficking of a minor. With the exception of one count of human trafficking, which we reverse on double jeopardy grounds, we affirm.

## I.     BACKGROUND

**{2}**     Defendant's trial focused upon events that took place in Texas and New Mexico at different times. As such, we set forth the relevant factual background concerning incidents in each state separately.

## A.     Texas Incidents

**{3}**     A woman by the name of Jordann D., also known as Stormy (Stormy), met Defendant while working at a strip club in San Antonio, Texas in October 2011. Defendant introduced himself as "D.G." and told Stormy it stood for "Da Greatest" as well as "D.G.P." which stood for "Da Greatest Pimp." Stormy was impressed that Defendant was well dressed and drove a Jaguar. He told her he worked for an escort company and that it was legal employment, not prostitution. Stormy believed the escort services would only involve spending time with clients without sex. Defendant told Stormy she could make good money as an escort in College Station, Texas, and that if she agreed to go with him, he would buy her heroin, which she started using regularly after meeting Defendant.

**{4}**     Defendant, with the help of Stormy and others, commonly used the website "Backpage.com" to post escort local ads in different cities to which they would travel, using such language as "hot, sexy, and ready" and "[s]e[x]y & [r]e[a]dy 2 p[l]ay." During Defendant's trial, the State introduced sixteen such Backpage.com ads, four of which were posted for Albuquerque. Before they arrived in College Station, Defendant arranged for such an ad about Stormy to be posted. Stormy answered calls related to that and other such ads, adhering to a "call module" that Defendant scripted to specify what she should say to potential clients.

**{5}**     Stormy learned that the escort services involved sex during the first few "in-calls" (when a client comes to the hotel for sex in exchange for money) in College Station, which took place while Defendant waited outside the room. She then asked to return home to San Antonio, to which Defendant responded, "Bitch, you're not going anywhere. I'm a pimp." Stormy testified that Defendant put his hand around her throat, then threw her in the shower and beat her, leaving the television volume turned up so no one could hear her screaming. After the incident, Stormy testified that, although she still wanted to go home, she did not ask again because she was afraid of again being beaten. She continued having sex with clients for money in College Station, afterward

handing all her earnings to Defendant. By then, in addition to having no money, Stormy did not have her identification because Defendant had taken it from her.

**{6}** Following a trip to Dallas for Thanksgiving, during which Defendant forced Stormy to perform fellatio on him and suggested he might force her to do so on his brother, as well, Stormy convinced Defendant that they should return to San Antonio. By then, she was withdrawing from heroin and suffering from anxiety, prompting Defendant to give her Xanax. On Christmas Eve 2011, Defendant also took Xanax and passed out, and Stormy escaped to meet her boyfriend. She then began to make escort appointments herself in San Antonio, keeping the money she made and avoiding heroin use.

**{7}** Not long after escaping from Defendant, Stormy received a "suspicious" call for a $400 appointment at a motel in a "shady" area of San Antonio. When Stormy entered the room, Defendant jumped out of the shower, banged her head against the mirror, hit her, and forced her to his car. Defendant then forced her to lay down in the backseat the entire way to Dallas. Stormy was scared that Defendant would make her shoot up heroin when they arrived, but instead, Stormy convinced Defendant to allow her to leave Dallas the next day. She did so claiming that her family may have alerted the police to her absence since she had not visited them at Christmas.

**{8}** About a year later, in December 2012, Stormy encountered Defendant on a street in San Antonio. At the time, she was again addicted to heroin, and Defendant said he could provide her all the heroin she wanted. She began working for Defendant again as an "escort," posting Backpage.com ads in different Texas cities.

## B.    New Mexico Incidents

**{9}** In January 2013, Defendant and Stormy came to New Mexico, and Defendant directed Stormy to recruit Tiffany G., a woman he had observed at the Greyhound Station in Albuquerque. Defendant had by then trained Stormy to "get girls, and post the ads, make sure everything was going smoothly," and Stormy's job was to make it seem like "a real good deal" to work in the escort business. At that time, Stormy was using heroin daily, was often sick, and Defendant used her addiction to control her. Tiffany was also a heroin user, and Stormy lured her with the promise of "scor[ing]" heroin if she joined Defendant's escort business. During that first trip in Albuquerque, at Defendant's direction Stormy posted Backpage.com ads and had many in-calls at the Days Inn on Tramway and I-40 as well as several out-calls (where she went to a client's house), for which Defendant collected the money. After Tiffany joined Defendant's escort operation, she, Defendant, and Stormy traveled to Texas, and returned to New Mexico in early February.

**{10}** On this second trip to New Mexico, Tiffany, Stormy, and Defendant stayed in Room 118 at the Days Inn at Hotel Circle in Albuquerque. There, Stormy and Tiffany had several "in-calls" and "out-calls" throughout the day, sometimes working through the night. If the in-call was for only one of them, the other would wait in the bathroom.

**{11}** On February 20, 2013, Defendant directed Stormy to recruit another woman, R.R., who was only seventeen years old, at the Albuquerque bus station. Defendant targeted "weak links" or "young girls that . . . don't know exactly what . . . they're getting themselves into" for Stormy to recruit. At the station, Stormy invited R.R. "to smoke some weed and drink and just chill" in Defendant's Cadillac while she waited for her bus. R.R. agreed, and was startled when Defendant and his nephew jumped into the front seat of the car and drove them to Days Inn. Defendant whispered to Stormy when they arrived at the hotel, "[y]ou know what you need to do[,]" which meant to her that she must convince R.R. to join Defendant's escort business. Defendant also sent Stormy texts that stated, "[l]ock [R.R.] up for our family" and "[m]ake sure she don't go nowhere." Stormy lied to R.R. that having sex with clients was not required because Stormy knew R.R. "would [not] agree to just having sex for money straight up."

**{12}** Stormy knew first she had to take R.R.'s purse away, "because it makes [girls] not want to leave if they don't have their ID." Then, she loosened R.R. up with drinks and marijuana and encouraged R.R. to shower and change her clothes, while Defendant went out to purchase an alluring outfit for her. Stormy then told R.R., "You can't go anywhere because [Defendant] is going to kill me if I let anything happen to you." R.R. testified that she was scared, never left alone, and that she did not try to leave because she did not know what they would do to her. When Defendant returned to Room 118 with Tiffany, Stormy gave R.R. purple lingerie Defendant bought for her to wear, and he took photos of them.

**{13}** Soon thereafter, they went to the Isleta Hard Rock Resort & Casino for a client call, and Defendant collected a thousand dollars from the client. There, R.R. had sex with the client while Stormy checked in on them from the bathroom, criticizing R.R. for throwing in "extras" (different sexual positions) without collecting more money. Stormy stated R.R. appeared drunk during the encounter, and notified Defendant by text that R.R. behaved childishly during an ensuing dinner with the client. Following dinner, Stormy and Tiffany agreed to have sex with the client's brother for $800 and left R.R. with the client. R.R. then convinced the client to help her escape, and when Stormy and Tiffany returned to collect R.R., the client hid R.R. in the adjoining room he purchased, and said that R.R. had left. R.R. did not leave that night because she was afraid that Defendant and Stormy would catch her in the lobby. That night, Defendant found R.R.'s ID in her purse and learned she was only seventeen.

**{14}** Two days later, on February 22, 2013, Stormy and Defendant were arrested in Albuquerque during a sting operation. While in jail, Stormy called Defendant for bail and food money, and also asked him to bail out Cordelia C., a friend she made in jail. Stormy told Cordelia that Defendant could bail her out if she worked for him.

## C.    Post-Arrest Events

**{15}** Cordelia planned to run away to her friend's house after she was bonded out of jail, but Defendant, himself by then released, was waiting for her when the prison transport dropped her off in downtown Albuquerque. As had Stormy, similarly Cordelia

testified Defendant bought her "sexy clothes" and heroin and drove her to a hotel in Tyler, Texas. Defendant posted ads on Backpage.com before they arrived, and Cordelia had sex with clients, for which Defendant collected the money. She wanted to escape but either "there was nowhere to run" or Defendant was nearby. She testified that she feared for her life because Defendant regularly physically abused her for being a "heroin junkie" or not making the beds correctly, and once Defendant choked her until his nephew stopped him. Ultimately, a client helped Cordelia escape from Defendant and she returned to Albuquerque.

## D.     Trial Proceedings

**{16}**     Defendant was indicted in April 2013 on several charges and again in December 2013 on another set of charges. In January 2014, the district court consolidated the cases for trial. Prior to trial, the State filed a notice of intent to introduce evidence derived from events in Texas under Rule 11-404(B)(2) NMRA and a brief in support. Defendant objected, arguing evidence of uncharged acts in Texas would be highly prejudicial, but following a hearing on the matter, the district court ruled in favor of the State. At trial, Stormy, R.R., and Cordelia testified, and Stormy was granted use immunity for her testimony. Defendant again raised objections regarding the introduction of evidence relating to events in Texas, but the district court adhered to its earlier determination, explaining that the evidence was relevant to Defendant's intent and that its probative value was not outweighed by unfair prejudice. The district court also provided two limiting instructions to the jury as to the proper use of the evidence.

**{17}**     Ultimately, Defendant was found guilty of two counts of human trafficking as to Stormy, one count of human trafficking as to R.R., a minor, two counts of promoting prostitution, two counts of accepting earnings of a prostitute, and kidnapping. After the guilty verdict, the district court sentenced Defendant to fifty-four years in prison, including a twenty-four-year enhancement under the habitual offender statute. Defendant appeals from the judgment, sentence and commitment entered on December 14, 2015, claiming error under Rule 11-404 and Rule 11-403 NMRA, a double jeopardy violation, insufficiency of evidence for the kidnapping charge, and instructional error for the human trafficking of a minor charge.

## II.     DISCUSSION

### A.     The Trial Court Did Not Abuse Its Discretion in Admitting Testimony Regarding Defendant's Uncharged Acts in Texas

**{18}**     Defendant argues that the district court erred in admitting testimony relating to Defendant's uncharged bad acts in Texas, contending that the evidence was inadmissible as propensity evidence under Rule 11-404 and unfairly prejudicial under Rule 11-403. We disagree.

**Standard of Review**

**{19}**   We review Defendant's assertions of error regarding the admissibility of evidence for an abuse of discretion. *See State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007. A district court abuses its discretion when it rules in a manner "clearly against the logic and effect of the facts and circumstances of the case" and its ruling is "clearly untenable or not justified by reason." *State v. Otto*, 2007-NMSC-012, ¶ 9, 141 N.M. 443, 157 P.3d 8 (internal quotation marks and citation omitted). "All relevant evidence is generally admissible, unless otherwise provided by law[.]" *State v. Balderama*, 2004-NMSC-008, ¶ 23, 135 N.M. 329, 88 P.3d 845. "Any doubt whether the evidence is relevant should be resolved in favor of admissibility." *Id.*

**{20}**   Rule 11-404(B)(1) instructs that "[e]vidence of a crime, wrong, or other act is [in]admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the other-act evidence may be permitted for other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). "Rule 11-404(B) is a rule of inclusion, not exclusion, providing for the admission of all evidence of other acts that are relevant to an issue in trial, other than the general propensity to commit the crime charged." *Bailey*, 2017-NMSC-001, ¶ 14 (alteration, internal quotation marks, and citation omitted). Evidence of a prior bad act is admissible "if it bears on a matter in issue, such as intent, in a way that does not merely show propensity." *State v. Sarracino*, 1998-NMSC-022, ¶ 22, 125 N.M. 511, 964 P.2d 72 (internal quotation marks and citation omitted).

**{21}**   However, when evidence is admissible under Rule 11-404, the district court must additionally determine "the probative value of the evidence outweighs the risk of unfair prejudice, pursuant to Rule 11-403." *Otto*, 2007-NMSC-012, ¶ 10. The rule provides that the court may preclude evidence if "its probative value is substantially outweighed" by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 11-403. In other words, the Rule 11-404(B) "other" purpose should be weighed against the jury's inclination to use the evidence improperly. *State v. Ruiz*, 1995-NMCA-007, ¶ 12, 119 N.M. 515, 892 P.2d 962. The unfair prejudice balancing is incredibly fact-sensitive and thus, "much leeway is given [to district] judges who must fairly weigh probative value against probable dangers." *Bailey*, 2017-NMSC-001, ¶ 16 (internal quotation marks and citation omitted). "Rule 11-403 does not guard against *any* prejudice whatsoever, but only against *unfair* prejudice." *Bailey*, 2017-NMSC-001, ¶ 16 (emphasis added).

**Evidence of Uncharged Acts in Texas Was Admissible Under Rule 11-404(B)**

**{22}**   In this case, Defendant's intent was an element of the charged human trafficking offenses. The jury was instructed that the State's burden of proof required that it demonstrate Defendant "intended or knew that force, fraud or coercion would be used to subject" victims to commercial sexual activity. Defendant argues that the evidence of the uncharged acts in Texas was improper propensity evidence and the State failed to articulate the purpose for such detailed testimony on events in Texas. Defendant highlights several instances of the evidence as improper and highly prejudicial

propensity evidence: (1) Stormy's testimony about three uncharged Texas incidents with Defendant involving physical abuse, sexual assault, and her recapture after escaping; (2) Cordelia's testimony about similar physical abuse, confinement, and prostitution in Texas; (3) exhibits of Backpage.com ads in Texas; and (4) references to Tiffany who did not testify at trial. Defendant also contends Stormy's lengthy testimony at trial was wrongly focused on her state of mind and vulnerabilities, rather than Defendant's intent. For the reasons we explained below, we are unpersuaded.

**{23}** First, the State properly notified Defendant under 11-404(B) that it planned to present evidence of other acts relevant to Defendant's intent and knowledge and articulated the purpose for the evidence as "Defendant's modus [operandi] and common plan or scheme." *See* Rule 11-404(B)(2)(a); *State v. Lucero*, 1992-NMCA-107, ¶ 10, 114 N.M. 489, 840 P.2d 1255 (stating that under Rule 11-404(B) "counsel [should] identify the consequential fact to which the proffered evidence of other acts is directed"). Although Defendant opposed the motion, arguing that the uncharged acts evidence was "minimally probative" and designed to prejudice the jury against Defendant, the district court agreed with the State that the evidence was relevant to Defendant's intent, demonstrating a common scheme and plan and the impact on Stormy if she did not comply.

**{24}** Second, under Rule 11-404(B) and our case law, the issue before us is whether the uncharged acts in Texas were, in fact, relevant to the material issue of Defendant's intent. *See Bailey*, 2017-NMSC-001, ¶ 13. We agree with the district court that they were. The evidence of the uncharged acts in Texas, Defendant's abusive conduct, was directly relevant to his intent to use force, fraud, or coercion to subject Stormy and R.R. to commercial sexual activity. *See id.* ¶¶ 10, 22 (affirming evidence of other acts in another county as relevant to the defendant's intent under New Mexico's inclusionary view of Rule 11-404(B)(2)); *Otto*, 2007-NMSC-012, ¶ 13 (holding that the evidence of uncharged acts in Colorado was relevant to the defendant's intent and not committed accidently or by mistake). Defendant argues that neither *Otto* nor *Bailey* should control our review because those cases involved only one victim, whereas here there are multiple victims; however, we find our New Mexico Supreme Court's Rule 11-404(B) reasoning to be both relevant and applicable.

**{25}** Specifically, Defendant's intent was shown by Defendant's modus operandi and common plan or scheme—that is, his pattern of recruiting and subjecting victims to commercial sexual activity. *See State v. Durant*, 2000-NMCA-066, ¶ 15, 129 N.M. 345, 7 P.3d 495 ("Intent can rarely be proved directly and often is proved by circumstantial evidence."). The uncharged acts evidence laid out of common pattern of gaining young women's trust, at times using Stormy as bait, by promoting the money-making potential in "escorting," then supplying controlled substances, controlling victims through addiction, physical abuse and threats of physical abuse, and ultimately coercing them to engage in commercial sexual activity for Defendant's profit. The district court also aptly noted that Defendant's arguments placed his intent directly at issue because his defense theory claimed Stormy was the key actor in the recruitment scheme and that it was not his plan or intent to force victims to engage in commercial sexual activity.

Indeed, defense counsel informed the district court that the "entire defense" was that Defendant was not a pimp and that "the primary person involved was [Stormy]," who had determined "how to run everything." To rebut this defense, the State had the right to present evidence that Defendant's actions were in fact intentional, part of *his* common scheme. *See Otto*, 2007-NMSC-012, ¶ 11. Though Defendant claims that the evidence relies on a propensity inference, under Rule 11-404(B), the key inquiry is whether there is a legitimate purpose for the evidence. *See State v. Bailey* (*Bailey II*), 2015-NMCA-102, ¶ 18, 357 P.3d 423; *see also State v. Kerby*, 2007-NMSC-014, ¶ 26, 141 N.M. 413, 156 P.3d 704 (holding that evidence was admissible to show that the defendant touched the victim with sexual intent and not propensity evidence because the defendant's state of mind was directly at issue). We conclude that the evidence was introduced for a proper purpose.

**{26}**     Third, as in *Otto* and *Bailey II*, the district court gave limiting instructions to the jury as to the proper use of the evidence of uncharged acts in Texas and regarding Stormy's testimony:

> The [S]tate must prove to you beyond a reasonable doubt that the elements of the crimes [Defendant] is charged with occurred in New Mexico. The [e]vidence that is being presented of events that occurred in [Texas] is being offered only so that you can understand the state of mind of the witness.

*See Otto*, 2007-NMSC-012, ¶ 4; *Bailey II*, 2015-NMCA-102, ¶ 25. The court also gave a similar instruction during Cordelia's testimony, modifying the last sentence to read: "The evidence that is being presented of events that occurred in [Texas is] *only being allowed to address any issues regarding* [D]*efendant's intent and motive.*" (Emphasis added.) Given that there were no charges related to Cordelia, the district court also specified in the second instruction that "[t]his evidence cannot be used for any other purpose." We presume that the jury followed the court's instructions. *Otto*, 2007-NMSC-012, ¶ 17. Therefore, we hold that the district court did not abuse its discretion by allowing evidence of the uncharged acts in Texas past the threshold of Rule 11-404(B), and the evidence was relevant to a material issue of Defendant's intent regarding the charged acts. We now evaluate the admission of the evidence under Rule 11-403.

**Rule 11-403 Did Not Preclude Evidence of Uncharged Acts in Texas**

**{27}**     Next, pursuant to Rule 11-403, we consider the balance between the probative value and the unfair prejudice of the evidence admitted under Rule 11-404(B)(2). Defendant argues that the evidence of uncharged acts in Texas is highly prejudicial, cumulative, and minimally probative, contrary to the district court's conclusion. We agree with the district court.

**{28}**     As stated above, we review a district court's balancing of probative value against unfair prejudice for abuse of discretion. *Otto*, 2007-NMSC-012, ¶ 14. Also, given the fact-driven nature of the legal determination, "much leeway is given [to] trial judges who

must fairly weigh probative value against probable dangers." *Bailey*, 2017-NMSC-001, ¶ 16 (internal quotation marks and citation omitted). Here, the evidence was particularly probative to show Defendant's contested intent. Without the evidence of the uncharged similar acts, the jury, for example, would more likely have (1) questioned Stormy's credibility regarding the circumstances of her presence with Defendant, and (2) believed that Defendant and Stormy acted collaboratively while in New Mexico. Based solely on Defendant's activities in New Mexico, limited evidence existed to rebut these potential inferences, and as noted earlier, intent is circumstantial, and one of the ways to establish Defendant's intent to coerce these women to engage in commercial sexual activity was to outline—based on similar act evidence—a common plan or scheme and coercive pattern of abuse. *See Durant*, 2000-NMCA-066, ¶ 15 ("Intent can rarely be proved directly and often is proved by circumstantial evidence."). As the district court stated, "the fact that [Defendant] did it in Texas doesn't mean that he intended it in New Mexico, but it serves as the background for his intent." Moreover, as to Cordelia's testimony in particular, the district court found the evidence to be highly probative of Defendant's intent, especially since direct evidence is rare. Moreover, the district court did not find Cordelia's testimony of recruitment and abuse to be too remote in time since they were within a week of the charged offenses. We agree.

**{29}** To reiterate, Rule 11-403 does not guard against *any* prejudice, but only against *unfair* prejudice. *See Otto*, 2007-NMSC-012, ¶ 16. Evidence is not unfairly prejudicial purely because it inculpates Defendant; instead, unfair prejudice occurs when the evidence *only* goes to character or propensity. *See Ruiz*, 1995-NMCA-007, ¶ 12. In the present case, the uncharged acts evidence was properly admitted to show Defendant's intent, and we cannot say that the district court abused its discretion in admitting the evidence of uncharged acts under Rule 11-403.

## B. Defendant's Conviction for Two Counts of Human Trafficking Violates Double Jeopardy

**{30}** Defendant argues that his right to be free from double jeopardy was violated because he was convicted of two counts of human trafficking of Stormy. We agree and vacate one of the convictions.

**{31}** The Federal and New Mexico Constitutions guard against double jeopardy violations, guaranteeing that no person shall be "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. "A double jeopardy challenge is a constitutional question of law which we review de novo." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. "[D]ouble jeopardy protects against both successive prosecutions and multiple punishments for the same offense." *State v. Contreras*, 2007-NMCA-045, ¶ 19, 141 N.M. 434, 156 P.3d 725 (internal quotation marks and citation omitted). This appeal involves the latter type—multiple punishments for the same offense, specifically a "unit of prosecution" claim, where Defendant argues he has been charged with multiple violations of a single statute based on a single course of conduct. *See State v. Gwynne*, 2018-NMCA-033, ¶¶ 9-10, 417 P.3d 1157, *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-36926, Apr. 10, 2018).

**{32}** "Unit of prosecution cases are subject to a two-step analysis that courts utilize to discern legislative intent. The relevant inquiry in a unit of prosecution case is whether the Legislature intended punishment for the entire course of conduct or for each discrete act." *State v. Bernard*, 2015-NMCA-089, ¶ 17, 355 P.3d 831 (alterations, internal quotation marks, and citations omitted). Defendant asserts the Legislature intended that punishment for violating the human trafficking statute, Section 30-52-1, to be for the entire course of conduct, here, "one count per victim," not one count for each separate instance.

**{33}** In our analysis, we first determine "whether the Legislature has defined the unit of prosecution." *Swick*, 2012-NMSC-018, ¶ 33. If it is defined, our inquiry is complete. *Id.* However, if the language is ambiguous, we review "whether a defendant's acts are separated by sufficient 'indicia of distinctness' to justify multiple punishments under the same statute." *Bernard*, 2015-NMCA-089, ¶ 17 (internal quotation marks and citation omitted). "If there is not sufficient indicia of distinctness to separate the defendant's acts, we apply the rule of lenity to our interpretation of the statute . . . [which] requires that we interpret the statute in the defendant's favor by invoking the presumption that the Legislature did not intend to create separately punishable offenses." *Id.* (internal quotation marks and citations omitted).

**{34}** The Legislature does not specify a unit of prosecution in the human trafficking statute, Section 30-52-1; therefore, the pertinent inquiry is whether Defendant's actions have a "sufficient indicia of distinctness" to permit multiple punishments. The *Herron* six-factor test, developed in a sexual assault case and applied in various contexts, evaluates whether a defendant's actions are sufficiently distinct, considering the "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *Bernard*, 2015-NMCA-089, ¶ 23 (internal quotation marks and citation omitted); *accord Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624; *see, e.g.*, *State v. Bernal*, 2006-NMSC-050, ¶¶ 20-21, 140 N.M. 644, 146 P.3d 289 (applying the *Herron* test to multiple convictions for attempted robbery); *State v. Boergadine*, 2005-NMCA-028, ¶ 21, 137 N.M. 92, 107 P.3d 532 (applying the *Herron* test to multiple convictions for fraud); *State v. Barr*, 1999-NMCA-081, ¶¶ 16-23, 127 N.M. 504, 984 P.2d 185 (applying the *Herron* test to multiple convictions of contributing to the delinquency of a minor); *State v. Handa*, 1995-NMCA-042, ¶¶ 19-27, 120 N.M. 38, 897 P.2d 225 (applying the *Herron* test to multiple convictions for assault). No single factor provides a clear remedy. *Boergadine*, 2005-NMCA-028, ¶ 21. "We may also consider whether [the d]efendant's acts were performed independently of the other acts in an entirely different manner, or whether such acts were of a different nature." *Id.* (internal quotation marks and citations omitted).

**{35}** Applying the principles of the *Herron* line of cases to the human trafficking statute, we examine any distinctness factors applicable under the facts of this case. Initially, we observe that no New Mexico case has applied the *Herron* distinctiveness

analysis to the human trafficking statute. The relevant portion of Section 30-52-1(A)(1) reads as follows:

> A.    Human trafficking consists of a person knowingly:
>
> (1)    recruiting, soliciting, enticing, transporting or obtaining by any means another person with the intent or knowledge that force, fraud or coercion will be used to subject the person to labor, services or commercial sexual activity[.]

{36}    Defendant was convicted of two counts of human trafficking involving the same victim, Stormy, between January 24, 2013, and February 7, 2013, during their first trip to Albuquerque, and again between February 17, 2013, and February 22, 2013, during their second trip to Albuquerque. We first address the fifth and sixth *Herron* factors—Defendant's intent, as evidenced by his conduct and utterances, and the number of victims—which weigh heavily against upholding Defendant's convictions for two counts of human trafficking of Stormy. *See Herron*, 1991-NMSC-012, ¶ 15. Considering the fifth factor, Defendant's intent and course of action was unchanged during the entire human trafficking scheme between January and February 2013 in New Mexico, despite the short trip to Texas in between. In *Boergadine*, we upheld separate convictions against a defendant when there was a "separate intent to defraud" between each of the charged acts as evidenced by "cash payments for different purposes . . . accompanied by [separate] assurances and justifications[.]" 2005-NMCA-028, ¶ 25. But the trial evidence here evinces no separate intent on the part of Defendant and no material change to the nature of the human trafficking crime that took place during the three-and-a-half week period of time encompassed by the charged counts. Rather, throughout this time, Defendant's intent remained consistent as best displayed by his standard modus operandi—he directed Stormy to post Backpage.com ads; Stormy (and Tiffany, for whom the State did not charge Defendant with human trafficking) engaged in in-calls at the hotel as well as out-calls at clients' homes, and Defendant collected the proceeds. There was no notable deviation in the nature of Defendant's "escorting" business nor did any meaningfully distinct activity take place that bears the capacity to separate the collective human trafficking activities in Albuquerque.

{37}    Consistent with his "one count per victim" argument, Defendant claims that once Stormy was enticed or recruited and working with him, he could not recommit the offense. We disagree with such a categorical proclamation, noting that Stormy parted ways with Defendant twice, and after both occasions he recruited her again—once forcibly. But these occasions are not relevant to our *Herron* analysis because Defendant's recommission of the offense in that manner did not take place in New Mexico, nor was there an intervening "rerecruitment" incident between the two counts against Defendant. We emphasize there may be occasions when a defendant recommits human trafficking, even with the same victim, but conclude that on this trial record there was no shift in Defendant's intent nor did his acts meaningfully differ between the last week of January 2013 and the first week of February 2013.

**{38}**   Considering the sixth factor, the charged counts only contemplate one victim during the course of conduct for trafficking we are considering in this case. *Herron* indicated "multiple victims will likely give rise to multiple offenses[.]" 1991-NMSC-012, ¶ 15. But here, Stormy is the only named victim in each count at issue. Therefore, this factor supports reversing one of the convictions because Defendant's actions vis-à-vis Stormy were insufficiently distinct to support multiple counts.

**{39}**   *Boergadine* states that the second and fourth *Herron* factors—the location of the victim and sequencing of the acts—"are more tailored to sex offenses, emphasizing that movement or repositioning of the victim between penetrations and the sequence in which different orifices were penetrated tends to establish separate offenses." *Boergadine*, 2005-NMCA-028, ¶ 23 (alteration, internal quotation marks, and citation omitted). In our case, the human trafficking statute proscribes the activities of "recruiting, soliciting, enticing, transporting or obtaining" and "subject[ing a] person to . . . commercial sexual activity[,]" and not the ancillary sexual offense itself. *See* § 30-52-1(A)(1). As such, similar to *Boergadine*'s reasoning, the second and fourth factors are less salient to our analysis here. 2005-NMCA-028, ¶ 23.

**{40}**   As well, the first and third *Herron* factors—the temporal proximity of the acts and the existence of an intervening event—do not alter our analysis to the extent necessary to affirm. As to the first, the temporal proximity of the acts, we reiterate that Defendant's overarching scheme of "escorting" the victims was consistent across cities. While there was a ten-day interval between the first and second trip to Albuquerque, in the broader scheme of Defendant's human trafficking activity of Stormy in both Texas and New Mexico, the temporal proximity of the charged acts is fairly close. In cases where we have held shorter time intervals to be a determinative factor, either the statute, the defendant's intent, or the distinct nature of the activity itself also supported separate charges, unlike in this case. *See Gwynne*, 2018-NMCA-033, ¶ 13 (upholding two counts of manufacturing child pornography based on separate acts of manufacture eight days apart); *Boergadine*, 2005-NMCA-028, ¶¶ 22, 25 (affirming three separate fraud convictions for false payment requests six days and two months apart since each payment was also for a different purpose with distinct assurances and justifications); *State v. Borja-Guzman*, 1996-NMCA-025, ¶ 21, 121 N.M. 401, 912 P.2d 277 (imposing separate punishments for transactions several hours apart because the relevant statute and the defendant's intent also supported treating each act of distribution as a separate charge).

**{41}**   Finally, with regard to the third factor—the existence of an intervening event—it is undisputed there was an intervening event between the two trips to Albuquerque. Defendant, Stormy, and Tiffany left New Mexico to visit Texas and returned to New Mexico ten days later. Each discrete act by Defendant—departing New Mexico, traveling to Texas, and returning to New Mexico ten days later—lends support to the distinct nature of the trafficking activity between the first and second trips to Albuquerque. However, this factor alone, with no change to Defendant's intent or to the nature of his human trafficking activity, cannot be determinative. *See Boergadine*, 2005-NMCA-028, ¶¶ 21, 25.

**{42}**     Accordingly, based on our assessment of the *Herron* factors, we conclude that Defendant's acts were not sufficiently distinct to support two separate counts of human trafficking for the same victim and thus, the rule of lenity applies and we interpret the statute in Defendant's favor to conclude that the Legislature did not intend separately punishable offenses. *Bernard*, 2015-NMCA-089, ¶ 17 ("If there is not sufficient indicia of distinctness to separate the defendant's acts, we apply the rule of lenity[,] . . . invoking the presumption that the Legislature did not intend to create separately punishable offenses.") (citation omitted). We therefore reverse one of Defendant's two convictions for human trafficking of Stormy.

## C.     Defendant's Kidnapping Conviction Was Supported by Sufficient Evidence

**{43}**     Defendant argues that the State failed to present sufficient evidence to sustain his kidnapping conviction. We disagree.

**{44}**     "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Gwynne*, 2018-NMCA-033, ¶ 49 (internal quotation marks and citation omitted). Evidence is viewed in the "light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). "We disregard all evidence and inferences that support a different result." *State v. Telles*, 2019-NMCA-039, ¶ 16, 446 P.3d 1194, *cert. denied*, 2019-NMCERT-___ (No. S-1-SC-37652, May 15, 2019). The ultimate question is "whether a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Granillo*, 2016-NMCA-094, ¶ 10, 384 P.3d 1121 (emphasis, internal quotation marks, and citation omitted). "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883.

**{45}**     Per its instructions, to convict Defendant of kidnapping R.R., the jury had to find that he "confined or transported [her] by deception" and "intended to hold [R.R.] against [her] will for the purpose of making [her] do something." Defendant broadly contends that there was insufficient evidence for the kidnapping charge because the State failed to prove confinement, deception, or that Defendant intended to do anything against R.R.'s will. We are not persuaded.

### Defendant Confined or Transported R.R. by Deception

**{46}**     Defendant claims that there was insufficient evidence to establish that he confined or transported R.R. by deception. However, the evidence Defendant identifies as insufficient could also be viewed by a rational jury to support a guilty verdict, and we resolve all reasonable inferences in favor of the verdict and disregard inferences that support a different result. *See Telles*, 2019-NMCA-039, ¶ 16; *Gwynne*, 2018-NMCA-033, ¶ 49. Defendant contends that R.R. could have left and that there is no evidence that she tried or wanted to leave, but the State presented substantial testimonial

evidence that R.R. was not free to leave and that Defendant trained Stormy to make girls stay by stealing their IDs. Indeed, R.R. ultimately sought assistance from a client so that she could leave, and explained why she had not previously, stating, "I was really scared. I didn't know these men. I didn't know what they were capable of. I didn't know if they would hurt me . . . I just stayed calm and just did what I had to do . . . I was never once alone." A rational juror could interpret R.R.'s testimony as circumstantial proof of confinement. *See Granillo*, 2016-NMCA-094, ¶ 10.

**{47}**    Even if there was no confinement, a reasonable jury could find that Defendant transported R.R. by deception, sufficient to convict Defendant of kidnapping R.R. Defendant argues that while he did transport R.R., he did not transport her "by deception," contending that R.R. was not misled by Stormy's invitation to smoke marijuana nor Stormy's reassurance that R.R. would be returned to the bus station. Defendant asserts that it was while they smoked marijuana that Stormy asked R.R. if she wanted to be an escort, and R.R. willingly agreed. At worst, Defendant claims the acts are recruitment, not kidnapping by deception. However, Defendant fails to acknowledge the substantial evidence that the State presented to establish methods Defendant employed to recruit "weak links" like R.R., including using Stormy to recruit as he had done on previous occasions.

**{48}**    Stormy testified that Defendant specifically instructed her to "go talk to [R.R.]" at the bus station. Then, Stormy invited R.R. to "smoke some weed and drink and just chill until [her] bus comes[,]" to which R.R. agreed. However, "as soon as [the girls] jumped in the [empty] car," Defendant and his nephew jumped in and drove them to the hotel. R.R. was visibly uncomfortable and indicated her disapproval, stating "I don't know if this is a good idea. I've got to catch my bus." The abrupt action of jumping in the car and driving R.R. away from the bus station while Stormy assured her she could make her bus could support a finding by a rational jury that Defendant "transport[ed] by deception." *See State v. Laguna*, 1999-NMCA-152, ¶ 13, 128 N.M. 345,  992 P.2d 896 ("[K]idnapping can occur when an association begins voluntarily but where the . . . real purpose is something other than the reason the victim voluntarily associated with the defendant.").

**{49}**    Stormy also testified that upon arrival at the hotel, Defendant whispered in her ear, "[y]ou know what you need to do," which meant "[she] had to make it seem like it was a really good deal that [R.R.] was getting herself into." Also from Defendant's direction, Stormy inferred that she needed to take away R.R.'s identification. Taken as a whole, contrary to Defendant's contentions, a reasonable jury could find transportation or confinement by deception in Defendant's "recruitment" activity.

**Defendant's Intent to Hold R.R. Against Her Will**

**{50}**    Defendant argues the State failed to establish his intent to hold R.R. against her will or even that he knew R.R. was held against her will, pointing to cases requiring "clear confinement" to find such intent. "Intent may be proved by inference from the surrounding facts and circumstances[.]" *State v. Muniz*, 1990-NMCA-105, ¶ 3, 110 N.M.

799, 800 P.2d 734. For example, Defendant argues his texts admitted into evidence were ambiguous because slang terms and expressions like "lock her up" or "[d]on't leave the new girl by herself, alone, with no one" do not establish confinement. Instead, he argues "lock her up" was more similar to "lock down"—to convince R.R. to work for him. However, a rational jury could interpret the texts literally and properly find them to be sufficient evidence of confinement. Again, Defendant also discounts the testimonial evidence the State presented to establish his intent. Stormy testified that after she took R.R.'s purse away from her, Stormy told R.R., "You can't go anywhere because [Defendant] is going to kill me if I let anything happen to you." As stated, R.R. expressed that she was scared and was never left alone. Moreover, R.R. explained, "[she] didn't want to take pictures [in lingerie] and "[she] wanted to leave so bad." While Defendant may disagree with the version of events the testimony presented, questions as to witness credibility or the weight of the evidence are left to the jury. *See State v. Godoy*, 2012-NMCA-084, ¶ 18, 284 P.3d 410; *State v. Estrada*, 2001-NMCA-034, ¶ 40, 130 N.M. 358, 24 P.3d 793.

**{51}** Viewing the evidence in a light most favorable to the verdict, a reasonable jury could find Defendant's intent to hold R.R. against her will based on the trial evidence.

**D.    The Jury Instruction Regarding the Human Trafficking of a Minor Charge Was Proper**

**{52}** Defendant argues that the district court improperly instructed the jury on the human trafficking of R.R. by failing to include the requirement that Defendant knew R.R. was under eighteen. We disagree.

**{53}** "The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. Specifically, in reviewing for instructional error, "we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Luna*, 2018-NMCA-025, ¶ 19, ___ P.3d ___ (internal quotation marks and citation omitted), *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-36896, Mar. 16, 2018). "Juror confusion or misdirection may stem from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.* (internal quotation marks and citation omitted).

**{54}** In this case, the district court instructed the jury as follows with respect to the human trafficking of R.R.:

> For you to find . . . Defendant guilty of human trafficking as charged in Count VII, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.    [D]efendant knowingly recruited, enticed, transported or obtaining by any means another person, [R.R.]; and

2.     [R.R.] was under the age of eighteen years; and

3.     [D]efendant intended or knew that [R.R.] would be caused to engage in commercial sexual activity; and

4.     This happened in New Mexico on or between February 20, 2013 and February 21, 2013.

**{55}** Defendant claims there was instructional error based on the plain language of Section 30-52-1(A)(2). The relevant portion of the statute reads:

A.     Human trafficking consists of a person *knowingly*:

. . . .

(2)     recruiting, soliciting, enticing, transporting or obtaining by any means a person under the age of eighteen years with the intent or knowledge that the person will be caused to engage in commercial sexual activity[.]

Section 30-52-1(A)(2) (emphasis added). The district court relied on comparable federal cases in determining "knowingly" describes the action of "recruiting, soliciting, enticing, transporting or obtaining," not the age requirement. Defendant, however, argues "knowingly" also modifies the age requirement, and contends the "different grammatical construction" of the New Mexico statute compared to federal law requires a different interpretation.

**{56}** This Court recently addressed the precise issue Defendant raises and ultimately, agreed with the district court's interpretation of the statute. *See State v. Jackson*, 2018-NMCA-066, ¶ 8, 429 P.3d 674, *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-37267, Oct. 15, 2018). There, after careful consideration of the legislative intent, the plain language of the statute, as well as the underlying state policies which grant special protection to minors, "we declin[ed] to expand the 'knowingly' requirement . . . to a person under the age of eighteen." *Id.* (internal quotation marks omitted); *see id.* (holding that "[t]he intentional exploitation of a person under the age of eighteen for commercial sexual activity amounts to a violation of Section 30-52-1(A)(2), regardless of a defendant's actual awareness of that person's age"). Therefore, we similarly conclude in the present case that the State was not required to prove Defendant knew R.R.'s age as an element of the offense, and that there was no instructional error. *See Jackson*, 2018-NMCA-066, ¶ 12.

## III.     CONCLUSION

**{57}** For the reasons set forth above, the rulings of the district court are affirmed in part and reversed in part. We remand to the district court with instructions to vacate the conviction for one count of human trafficking and to resentence accordingly.

**{58}** IT IS SO ORDERED.

**J. MILES HANISEE, Chief Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**ZACHARY A. IVES, Judge**