The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: December 16, 2025

**No. A-1-CA-41845**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**ALFORD T. JOHNSON III,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Daylene A. Marsh, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Meryl E. Swanson, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

{1}     Following a jury trial, Defendant Alford T. Johnson III was convicted of shooting at a dwelling, contrary to NMSA 1978, Section 30-3-8(A) (1993); aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963); abandonment of a child, contrary to NMSA 1978, Section 30-6-1(B) (2009); and criminal trespass, contrary to NMSA 1978, Section 30-14-1(B) (1995). On appeal, Defendant argues that (1) the evidence of child abandonment presented by the State was insufficient as a matter of law; (2) the State failed to prove that Defendant shot at a dwelling; (3) Defendant's convictions for shooting at a dwelling and aggravated assault violate principles of double jeopardy; and (4) evidentiary error and prosecutorial misconduct cumulatively deprived Defendant of a fair trial. For the reasons discussed below, we affirm.

**BACKGROUND**

{2}     On the evening of January 13, 2023, Defendant left his home to take a walk around his neighborhood. A bit thereafter, James Moore (Victim), observed a trespasser in his backyard initially on his home security cameras. Victim went outside, approached and tried engaging with the trespasser, who said nothing and continued toward the front of Victim's property, hopping over a gate and departing from the front of Victim's property. When Victim began walking back toward his

home, he heard gunshots coming from the side of his property, prompting him to run inside and ask his wife to call the police.

{3} Shortly thereafter, Defendant was stopped nearby on foot at the intersection of Largo Street and Kayenta Drive by police responding to Victim's call. Defendant was wearing a dark hoodie, khaki pants, and a beanie hat, all of which matched the description of the person described to police by Victim's wife. Police detained Defendant, and a search of his person revealed a firearm, one empty fifteen-bullet magazine, and a second such magazine holding thirteen bullets. Defendant told police the firearm was for his protection while he was on a walk and admitted that he was intoxicated. Defendant also informed police that his five-year-old son, M.J., was alone and asleep at his house.

{4} Victim was brought to the location where Defendant was being held and Victim identified Defendant as the person he had encountered on his property. From there, police took Victim back to his home, asked for his home security footage, and began searching the property for evidence of bullet casings. Police eventually found seventeen bullet casings on the road in front of Victim's home, an impact location on Victim's pool house, and were later made aware by Victim of an impact location on Victim's "shop." Video security footage revealed sparks where bullets struck the pavement in front of Victim's home and outside the exterior gate.

**{5}** Defendant was charged with shooting at a dwelling, aggravated assault with a deadly weapon, abandonment of a child, two counts of criminal trespass and negligent use of a deadly weapon. The jury found Defendant guilty of all charges but for a single count of criminal trespass that the State dropped the morning of trial. This appeal followed.

**DISCUSSION**

**{6}** Defendant makes several assertions of error on appeal that we address in the order raised.

## I. There Was Sufficient Evidence of Child Abandonment

**{7}** Defendant asserts that there was insufficient evidence to support his conviction for child abandonment under Section 30-6-1. In his argument, Defendant maintains that the State failed to show that he put his child at risk and urges this Court to define "risk of harm" as it appears in the annotations of Section 30-6-1(B), which as the jury was instructed required it to find in pertinent part that "[a]s a result of [D]efendant leaving or abandoning [M.J.], [M.J.] was without proper parental care and control necessary to prevent harm to [him]" and that "the circumstances exposed [M.J.] to a risk of harm." More specifically, Defendant suggests that in doing so, this Court be guided by the standard for civil negligence in the context of child neglect, and not that with which the jury was instructed to establish Defendant's potential criminal culpability, as the statutes are otherwise identical. Defendant raises this

issue for the first time on appeal, as the record reflects that he did not request a jury instruction defining "risk of harm." Our standard of review as applied to jury instructions depends on whether an issue has been preserved, and if it has not been preserved, we review for fundamental error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

{8}      Defendant points to *State ex rel. Children, Youth and Families Department v. Heather S.*, 2025-NMSC-002, 563 P.3d 821, which addresses the civil abuse and neglect "risk of harm" element under NMSA 1978, Section 32A-4-2(G)(2) (2018, amended 2025) with a two-part test. *See Heather S.*, 2025-NMSC-002, ¶ 29. Defendant claims that under the standard for civil neglect, there is insufficient evidence to support his conviction of child abandonment.[1] Unable to agree that such analysis is legally sound in the criminal context, which is geared toward the punitive consequences of child abandonment rather than the immediate safety of a child that has been abandoned, we analyze Defendant's claim under Section 30-6-1(B). *See State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts

_____

[1]In *Heather S.*, our state Supreme Court defined "risk of harm," stating, "[T]he child must be subjected to circumstances that create a serious risk to the child's mental or physical health and safety. A serious risk is one that is likely to result in important or dangerous consequences for the child." 2025-NMSC-002, ¶¶ 35, 36. It is not clear to us that even were this the standard applicable to this case the result would be different given evidence that Defendant left M.J. alone and engaged in the acts committed against Victim, evidence suggesting that in so doing Defendant created a serious risk to the physical health and safety of M.J. that likely could have resulted in dangerous consequences to M.J.

will not consider an issue if no authority is cited in support of the issue and . . . given no cited authority, we assume no such authority exists.").

{9}     Accordingly, the applicable test to determine sufficiency remains "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. "A reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.* This Court "does not weigh the evidence and may not substitute its judgment for that of the fact[-]finder so long as there is sufficient evidence to support the verdict." *Id.* Where "a jury verdict in a criminal case is supported by substantial evidence, the verdict will not be disturbed on appeal." *Id.*

{10}     The jury was instructed that in order to find Defendant guilty of child abandonment, the State was required to prove beyond a reasonable doubt, in pertinent part, that "[D]efendant left or abandoned [M.J.]" and that "[a]t the time that [D]efendant left or abandoned [M.J.], the circumstances exposed [M.J.] to a risk of harm." Defendant argues that the State failed to show that he left M.J. under circumstances that placed him at risk, likening the instant facts to those of *State v. Stephenson*. *See* 2017-NMSC-002, ¶¶ 1-2, 389 P.3d 272 (holding there to have been

insufficient evidence to conclude that a mother who left her child in his locked bedroom for the night did so under circumstances where that child might have or did suffer neglect). We disagree.

{11} Here, just as in *Stephenson*, the State is not required to show that Defendant left M.J. without the intent to return, but rather whether there was sufficient evidence for a reasonable juror to conclude that Defendant intentionally left M.J. at a time when and under circumstances where M.J.'s well-being was at risk of harm. *See id.* ¶ 17. Defendant contends that he intended to take a "[five-] to [ten]-minute walk" after putting M.J. to sleep and had he not been arrested, he would have returned home before M.J. awoke. Defendant also argues that the State presented no evidence that M.J. had a history of waking up in the middle of the night or that dangerous circumstances in Defendant's home presented a "particular risk of harm over a short period of time." Defendant's argument is unsound.

{12} While the State points out that Defendant was a mile away from his home where M.J. was sleeping at the time of his arrest, the State also points out that Defendant put himself in a position by which he could have been unable to let anyone know that M.J. was home alone without care. This Court acknowledges that "the Legislature did not intend to criminalize conduct creating a mere possibility, however remote, that harm may result to a child." *Id.* ¶ 28 (internal quotation marks and citation omitted). However, the facts of this case do not present mere possibility,

as was the case when the child in *Stephenson* was put to bed for the night in a room near where his parents slept, but rather what actually happened—Defendant left his five-year-old alone while he traipsed through the neighborhood intoxicated, armed, and intending to cause criminal mischief, and therefore put M.J. at a risk of harm, as M.J. was alone in Defendant's home with no adult present or able to return to resume caretaking responsibilities.

{13}    Our state's Supreme Court recognized in *Stephenson* that "to uphold [the d]efendant's conviction could potentially criminalize parents' actions every single time they tuck[ed] their children into bed and harm befalls their children at night through some unfortunate accident, which we refuse to do." *Id.* Such a circumstance stands in stark contrast to Defendant's choice to criminally trespass while armed and intoxicated and fire multiple bullets in the direction of Victim and his house, which foreseeably placed M.J.'s well-being at risk should Defendant himself have been shot by Victim—or arrested, as he was. We conclude, then, that there was sufficient evidence that supports Defendant's conviction for child abandonment.

**II.    There Was Sufficient Evidence that Defendant Shot at a Dwelling**

{14}    Defendant's next contention is that the State failed to prove that he shot "at" a dwelling, asserting that under the State's theory, Defendant was shooting only at Victim and not at his home. In arguing that there is insufficient evidence to support his conviction for shooting at a dwelling, Defendant claims that the State did not

present sufficient evidence that he intentionally shot at Victim's home and analogizes the facts here to those in *State v. Comitz*. *See* 2019-NMSC-011, ¶ 18, 443 P.3d 1130 (determining that the defendant intentionally targeted individuals and not the house behind them, and therefore trial evidence was insufficient to support conviction of felony murder predicated on the felony of shooting at a dwelling). The State asserts that the facts here are distinguishable from those of *Comitz*, while also stating that the evidence presented at trial was sufficient to convict Defendant of shooting at a dwelling, and we agree. *See id.*

{15}    We apply the same standard of review stated previously regarding sufficiency of the evidence. We address Defendant's argument here in two parts: first, as the facts of this case relate to *Comitz*; and second, the element instruction given to the jury.

{16}    Defendant's assertion that the facts of the case before us are similar to that of *Comitz* and consequently warrant the same outcome is flawed. *See* 2019-NMSC-011. In *Comitz*, days after a physical altercation regarding a narcotic debt between the defendant and his friend's stepson, the defendant—along with armed friends—returned to his friend's home armed with a handgun, shooting to death one victim and injuring two others. *Id.* ¶¶ 2-8. Despite evidence a dwelling was behind the direction to which many bullets were fired, our Supreme Court concluded that the State failed to prove that the defendant committed the predicate felony of shooting

at a dwelling, and that evidence showed that "the goal of [the d]efendant and his companions was to shoot *at* the [victims], not *at* the house." *Id.* ¶ 18. Our Supreme Court noted the absence of "bullet trajectory evidence" to demonstrate aim at the dwelling, rather than the victims. *Id.* ¶ 22. There is a very stark contrast between those facts and the facts of this case.

{17}    Our view of the instant facts is that they are more akin to those of *State v. Arrendondo*. *See* 2012-NMSC-013, 278 P.3d 517 (holding that when a jury considered evidence of bullets entering a home and the trajectory of those bullets, they could reasonably infer that the defendant intentionally shot at a dwelling). Here the State, as in *Arrendondo*, presented evidence supporting the conclusion that Defendant intentionally shot at Victim's home. *See id.* ¶¶ 36-37. For example, the hail of gunfire Defendant fired hit a pool house on one side of the house and a shop on the opposite end of the property. Victim testified that the damage to the shop was found "roughly fifteen [feet] up from the outside level" and that he heard bullets "whizzing through the trees" that stood between Defendant on one side and Victim and his house on the other. Unlike in *Comitz* but similar to *Arrendondo*, these facts indicate that Defendant fired from the street indiscriminately toward Victim's home.

{18}    Here, the jury was instructed that in order to find Defendant guilty of shooting at a dwelling, the State was required to prove beyond a reasonable doubt that, in pertinent part, "[D]efendant willfully shot a firearm at a dwelling" and "knew that

the building was a dwelling." *See* UJI 14-340 NMRA. The crime of shooting at a dwelling or occupied building is substantively defined as "willfully discharging a firearm at a dwelling or occupied building." Section 30-3-8(A). The evidence supports a finding that Defendant willfully shot his firearm at a dwelling and had knowledge that it was a dwelling because of his interaction with Victim, as required by Section 30-3-8(A), and by the elements instruction. Viewing the evidence "in the light most favorable to the guilty verdict and indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict," we conclude that the State presented sufficient evidence to prove that Defendant shot at a dwelling. *See Comitz*, 2019-NMSC-011, ¶ 16.

**III.    Defendant's Convictions Do Not Result in a Double Jeopardy Violation**

{19}    Defendant's third contention is that his convictions for shooting at a dwelling and aggravated assault resulted in double jeopardy. Defendant argues that although he fired multiple shots, the conduct of shooting at a dwelling and the aggravated assault cannot be separated, making the conduct unitary. The State contends that Defendant's conduct was not unitary, evidenced not only by the gunshots hitting opposite sides of Victim's property but also by the number of shell casings recovered near Victim's home and their relation to the missing bullets from two clips found on Defendant's person.

**{20}** "Appellate review of a claim that multiple punishments have been imposed for the same offense in violation of the Fifth Amendment prohibition against double jeopardy presents a question of law which we review de novo." *State v. Sena*, 2020-NMSC-011, ¶ 43, 470 P.3d 227. Defendant contends that he was unconstitutionally subjected to multiple punishments for the same conduct under two different statutes. *See Swafford v. State*, 1991-NMSC-043, ¶ 9, 112 N.M. 3, 810 P.2d 1223 (describing double description cases). The *Swafford* Court provided a two-part analysis for evaluating such "double description" challenges. *Id.* ¶ 25. The first part of the analysis asks "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes." *Id.* If it is established that the conduct is unitary, we then move to the second part of the analysis, which focuses on the statutes in question "to determine whether the legislature intended to create separately punishable offenses." *Id.*

**{21}** "When determining whether [the d]efendant's conduct was unitary, we consider whether [the d]efendant's acts are separated by sufficient indicia of distinctness." *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). "Conduct is unitary when not sufficiently separated by time or place, and the object and result or quality and nature of the acts cannot be distinguished." *State v. Silvas*, 2015-NMSC-006, ¶ 10, 343 P.3d 616. "Distinctness may also be established by the existence of an intervening event,

the defendant's intent as evinced by his or her conduct and utterances, the number of victims, and the behavior of the defendant between acts." *State v. Barrera*, 2001-NMSC-014, ¶ 36, 130 N.M. 227, 22 P.3d 1177 (internal quotation marks and citation omitted). "The proper analysis is not what a reasonable jury could have concluded but whether there are 'sufficient facts in the record' to support distinct conduct which would defeat a double jeopardy claim." *State v. Phillips*, 2024-NMSC-009, ¶ 41, 548 P.3d 51 (quoting *State v. Sanchez*, 1996-NMCA-089, ¶ 11, 122 N.M. 280, 923 P.2d 1165).

{22}     As the State argues, "Defendant's intent was not limited to assaulting [Victim]—Defendant also intended specifically to shoot the dwelling," and we agree. There are sufficient facts in the record to support distinct conduct. The jury was presented with Victim's testimony and video evidence from Victim's security camera system showing Defendant walking then running from Victim toward Victim's front gate. Defendant is shown scaling the gate and is depicted running in a northeasterly direction on Railroad Street toward Largo Street. Victim testified that he did not follow Defendant off the property, and the video shows him instead turning and walking back toward his house. Seconds later, three flashes of light can be seen coming from the area where Defendant ran down Railroad Street. Defendant testified that he believed those flashes were gunfire ricocheting off of Railroad Street toward the front gate, which was the last place Defendant interacted with Victim.

The trajectory of those shots was not in the direction of the home, but in the location near where Defendant interacted with Victim last.

{23}     Separately, Victim testified that he heard bullets "whistling through the trees" and that "he was concerned that he might get shot" as he was sprinting into his house. And evidence was presented that two of Defendant's shots impacted structures on extreme opposite sides of Victim's property. For example, the impact on the pool house supports a bullet traveling in a northwesterly direction, while the gunfire down Railroad Street toward the gate supports bullets traveling in a southwesterly direction. This indicates that Defendant intended to shoot not only at Victim but also separately at his home and other structures.[2] *See Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624 (providing that a change in the defendant's intent supports distinct conduct); *cf. State v. Demongey*, 2008-NMCA-066, ¶ 16, 144 N.M. 333, 187 P.3d 679 (stating that there was no evidence indicating that the defendant rethought his actions or ceased his actions and then reformulated his intent).

{24}     The jury was free to reject the State's theories as to Defendant's conduct, but we will not substitute our judgment for that of the finder of fact. *See State v.*

---

[2]This case is similar to a memorandum opinion filed by this court last year, in which the defendant shot bullets through both the front and rear windows of his own truck. *See State v. Andazola*, A-1-CA-39763, mem. op. (N.M. Ct. App. Apr. 20, 2023) (nonprecedential). In *Andazola*, we wrote that the "fact that the second shot was fired in the opposite direction indicates that [the d]efendant had a different objective and intent in discharging his firearm the second time." *Id.* ¶ 16.

*Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737. As this conduct is not unitary, we need not evaluate whether the Legislature intended to create separately punishable offenses. *See State v. Torres*, 2018-NMSC-013, ¶ 21, 413 P.3d 467 ("When unitary conduct is the basis for multiple convictions, we must attempt to determine whether the Legislature intended to punish the crimes separately." (alterations, internal quotation marks, and citation omitted)). Therefore, we hold that Defendant's convictions for both shooting at a dwelling and aggravated assault do not violate double jeopardy.

## IV.    Defendant's Unpreserved Claims of Error Did Not Result in Plain Error

{25}    Defendant's final contention is that several unpreserved evidentiary errors and prosecutorial misconduct cumulatively deprived him of a fair trial. Specifically, Defendant contends that (1) his attorney did not object to improper testimony regarding uncharged acts at the Smith house and addressing the ultimate issue by asserting he committed abandonment and substantiating the case agent's charging decisions; (2) prosecutorial misconduct in closing argument requires reversal; and (3) cumulatively, evidentiary error and misconduct require reversal for a new trial. We review unpreserved evidentiary matters for plain error, *see State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056, and unpreserved claims of prosecutorial misconduct for fundamental error. *See State v. Trujillo*, 2002-NMSC-005, ¶ 52, 131 N.M. 709, 42 P.3d 814.

**{26}** The doctrine of plain error, arising from our Rules of Evidence, applies specifically to evidentiary matters and permits a court to "take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved." Rule 11-103(E) NMRA. "To find plain error, the Court must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict." *Montoya*, 2015-NMSC-010, ¶ 46 (internal quotation marks and citation omitted). "[I]n determining whether there has been plain error, we must examine the alleged errors in the context of the testimony as a whole." *Id.* (omission, internal quotation marks, and citation omitted).

**A.** **Uncharged Acts at the Smith House and the Police Officers' Testimony**

**{27}** At trial, Paula and Ken Smith (Mr. Smith and Mrs. Smith) testified regarding events that happened to them the same night that Defendant was arrested. Mrs. Smith testified that she was woken up by someone trying to enter her bedroom by rattling the bedroom doors from the exterior of the home in her backyard. Mrs. Smith stated that "[i]t was terrifying" and that she immediately went to find her husband across the hall to alert him that someone was trying to enter their home, and then called the police. Mr. Smith testified that he went out the front door of the home and noticed someone walking on his driveway. Mr. Smith stated that the trespasser was wearing a black hoodie and was about five feet, ten inches tall. Mr. Smith tried engaging with

the trespasser, who told Mr. Smith that he was "lost" and eventually left the Smiths' property.

{28} Defendant argues that all testimony brought by the Smiths was evidence of uncharged conduct that could serve no other purpose than propensity under Rule 11-404(B) NMRA, and that because the State dismissed the original Count 4 (trespass at the Smiths' home), defense counsel had not reviewed an amended information or jury instructions before the State's case-in-chief. Defendant also argues that testimony by Officers Lin and Standley constitutes plain error because it bore on the "ultimate issue" of child abandonment.

{29} We note that "Rule 11-404(B) is a rule of inclusion, not exclusion, providing for the admission of all evidence of other acts that is relevant to an issue in trial, other than the general propensity to commit the crime charged." *State v. Phillips*, 2000-NMCA-028, ¶ 21, 128 N.M. 777, 999 P.2d 421 (internal quotation marks and citation omitted). Evidence of a prior bad act is admissible "if it bears on a matter in issue, such as intent, in a way that does not merely show propensity." *State v. Sarracino*, 1998-NMSC-022, ¶ 22, 125 N.M. 511, 964 P.2d 72 (internal quotation marks and citation omitted). "If evidence of prior acts is relevant and admissible for a purpose other than proving a defendant's propensity to commit a crime, the probative value of evidence must outweigh its prejudicial effect." *State v. Hnulik*, 2018-NMCA-026, ¶ 28, 458 P.3d 475.

{30} The State offered the Smiths' testimony as "circumstantial evidence that was relevant to the non[]propensity issues" and not to confirm evidence of Defendant's alleged other acts. Although the incident at the Smiths' home did not lead to trial, the State argues that their testimony was relevant to the identity of the Defendant and for rebutting Defendant's "claim that he was simply out for an innocent walk when he encountered police." The State also contends that admission of the Smiths' testimony was not unduly prejudicial as the Smiths did not affirmatively state that the trespasser who entered their property was Defendant, nor that the trespasser was armed with a weapon or committed any acts of violence on their property. We agree with the State.

{31} Moving to the testimony of both Officers Lin and Standley, we are not persuaded that either officer gave their opinion as to the ultimate issue in the case. It is undisputed by the parties that "it is improper for a law enforcement officer to give his opinion as to the ultimate issue in [a] case." *See State v. Ashley*, 1997-NMSC-049, ¶ 19, 124 N.M. 1, 946 P.2d 205. Neither officer was asked to reach a legal conclusion or offered a legal conclusion as to whether Defendant committed the crime of child abandonment, but rather each testified to the information gathered from the investigation such as what they were told by Defendant about where M.J. was at the time he was arrested. The jury was free to reject both the testimony of Officers Lin and Standley as the jury had other evidence to make its determination

of Defendant's guilt as to the child abandonment charge, such as the lapel footage and testimony from M.J.'s mother. *Cf. Lopez v. Heesen*, 1961-NMSC-122, ¶ 28, 69 N.M. 206, 365 P.2d 448 ("Opinion evidence on an ultimate issue of fact does not attempt or have the power to usurp the functions of the jury, and this evidence could not usurp the jury's function because the jury may still reject these opinions and accept some other view."). To the extent the officers' testimony could be viewed as answering any of the ultimate questions, we are not "convinced that admission of [such] testimony constituted an injustice that created grave doubts concerning the validity of the verdict[s]" after considering "the testimony as a whole." *Montoya*, 2015-NMSC-010, ¶ 46 (internal quotation marks and citations omitted).

{32}     We hold that it was not plain error to admit the testimony of the Smiths and Officers Lin and Standley without objection from the defense at trial.

**B.     Prosecutorial Misconduct**

{33}     Defendant next argues that statements made by the State during closing argument constitute prosecutorial misconduct warranting reversal, specifically when the State asked the jury "not to hold it against" the State when it failed to present forensic evidence, and rather only rely on what was presented to the jury throughout the trial.

{34}     When no claim of prosecutorial conduct was raised at trial, we review for fundamental error. *See State v. Allen*, 2000-NMSC-002, ¶ 95 128 N.M. 482, 994

P.2d 728. While we find no error in the statement by the State during closing argument, we will explain why even if the comment were erroneous, it falls short of fundamental error. *See State v. Sosa*, 2009-NMSC-056, ¶ 35, 147 N.M. 351, 223 P.3d 348.

{35} Fundamental error occurs when prosecutorial misconduct in closing statements compromises a defendant's right to a fair trial, and we will reverse a conviction despite defense counsel's failure to object. *See State v. Rojo*, 1999-NMSC-001, ¶ 55, 126 N.M. 438, 971 P.2d 829. In order to find fundamental error, we must be convinced that the prosecutor's conduct created "a reasonable probability that the error was a significant factor in the jury's deliberations relative to the other evidence before them." *DeGraff*, 2006-NMSC-011, ¶ 22. In order to determine whether Defendant was deprived of a fair trial, this Court "review[s] the comment in context with the closing argument as a whole . . . so that we may gain a full understanding of the comments and their potential effect on the jury." *State v. Fry*, 2006-NMSC-001, ¶ 50, 138 N.M. 700, 126 P.3d 516 (internal quotation marks and citation omitted). "[T]he general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal." *Sosa*, 2009-NMSC-056, ¶ 29, 147 N.M. 351, 223 P.3d 348 (internal quotation marks and citation omitted).

{36} Upon reviewing the record, we conclude that the State's closing argument when analyzed as a whole did not deprive Defendant of a fair trial. We conclude that

the State's statements regarding the absence of testing connecting the seventeen casings to Defendant's firearm was not the primary focus of the State's closing argument, and we therefore cannot say that it impacted the jury's verdict. As Defendant points out, the State reiterates its argument that Defendant's gun and magazines would have held thirty-one rounds fully loaded, which was consistent with the seventeen casings and fourteen live rounds found on him when stopped by the police. Further, as the State attests, some of the statements made in closing argument by the State regarding the seventeen casings were in response to Defendant's closing argument. We cannot conclude that the State's comments during closing argument significantly altered the trial or confused the jury. *See id.* ¶ 34 ("[T]he common thread running through the cases finding reversible error is that the prosecutor[']s comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial.").

**{37}**     With the evidence presented by the State at trial considered as a whole, as well as the minimal prejudicial effect of its comments during closing argument, we hold that Defendant has not shown fundamental error.

**{38}**     Because we found no evidentiary error nor prosecutorial misconduct, we need not address Defendant's claim that together those claims require reversal.

**CONCLUSION**

**{39}**     For the reasons set forth above, we affirm.

**{40}   IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JACQUELINE R. MEDINA, Chief Judge**

_____
**KRISTOPHER N. HOUGHTON, Judge**